## BARNES et al. v. WATERMAN.

(Supreme Court, Special Term, Dutchess County. June 1, '1907.)

1. CANCELLATION OF INSTRUMENTS—EVIDENCE—SUFFICIENCY.

In an action to declare void certain annuity contracts between defendant and a decedent, evidence considered, and *held* sufficient to show that the contracts were executed by the decedent under undue influence of defendant, and were unconscionable and void.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 8, Cancellation of Instruments, §§ 102, 103; vol. 11, Contracts, § 441.]

2. ANNUITIES—TESTAMENTARY CAPACITY.

> The fact that a decedent made a will, which made a just disposal of his property and was probated, does not establish the validity of an annuity contract made by him, since the capacity required is not the same.

Action by Helen M. Barnes, by her guardian ad litem, and another, against Arthur H. Waterman, individually, etc. Judgment for plaintiffs.

Allison Butts (Frank B. Lown, of counsel), for plaintiffs.
Bruce R. Duncan, for defendant.

MORSCHAUSER, J. This action was commenced for the purpose of declaring null and void two annuity agreements, dated April 8, 1904, and October 6, 1904, respectively, which were made and entered into between the defendant and one Robert T. Hicks, now deceased. The plaintiffs are the residuary legatees under the will of said Robert T. Hicks, deceased. Anthony D. Schroeder and the defendant, Waterman, were the executors of said will. Mr. Schroeder, as such executor, was originally joined as one of the plaintiffs herein; but he died after the suit was commenced, and by an amendment made upon the trial his name as executor was stricken out as one of the plaintiffs, and Arthur H. Waterman was made a defendant in his representative capacity, as well as individually.

It is claimed in the complaint that the decedent was in feeble health and of weak and impaired mind at the time that these annuity agreements were entered into; that the defendant bore confidential and advisory relations to the decedent; that the contracts of annuity should not have been entered into, and were made with a fraudulent intent, and were unfair and improper contracts; that by reason of the feeble condition of the decedent, and because of the relation existing between the defendant and decedent, and because of the acts and conduct of defendant, such contracts were fraudulent and void. The plaintiffs demand judgment that the agreements be set aside and adjudged to be null and void, and that the defendant, Waterman, be directed to render an account of the moneys and property received by him under the agreements, and that the moneys remaining in his hands, after deducting the sums paid by him to Robert T. Hicks, be adjudged to be assets of the estate in his hands, with a direction that he collect, hold, and account for the said moneys as executor. The answer of the defendant is a general denial of the allegations of the plaintiffs' complaint, except as to the making and executing of the two annuity agreements, and the answer alleges that the agreements were binding upon the defendant during his lifetime, and after his death were binding upon his heirs, executors, and administrators. The defendant also sets up as a defense that the decedent acquiesced in the agreements and ratified the same.

The first of the annuity agreements was entered into on April 8, 1904, by which the decedent paid to the defendant $8,000, and the decedent was to receive an annual income of $900 during his lifetime, to be paid in monthly payments of $75. The second agreement was made on October 6, 1904, by which the defendant received $6,300 and he agreed to pay to the decedent the sum of $630 annually, to be

paid in monthly payments of $62.50. Mr. Hicks died within a year of the making of the first agreement and within six months of the date of the second contract.

The decedent, Robert T. Hicks, at the time of his death on March 14, 1905, was in his sixty-seventh year. He was unmarried, and had lived in Brooklyn since 1880. Fourteen years prior to his death he had an attack of what is known as shaking palsy, commencing in one hand and progressing from year to year, until finally both hands and legs were affected. His hands would shake and keep in motion, sometimes one hand more than the other, and as years progressed it very seriously affected his entire body. His feet would drum on the floor continuously, and after a time his throat became involved, and he could scarcely be understood. At times he was quite despondent, having crying spells, and was sometimes under the impression that he would survive but a very short time. He had to be fed, dressed, and undressed. His muscles became rigid. He could not answer the calls of nature without assistance, and he had little, if any, control of himself. He was continually drooling. His condition in the later years of his life was that of a feeble, decrepit, and lonely old man, suffering from a disease which was gradually sapping away his life—a disease which, as time went on, rendered him more feeble and helpless. He had neither wife nor child, and his unfortunate, palsied condition made him an invalid, and much of the time not fully conscious of his surroundings. The defendant, Waterman, was a real estate broker, and had been for a number of years a dealer in real estate in Brooklyn, having on hand numerous real estate transactions. He is a bright, energetic business man, and his appearance and testimony indicated more than ordinary ability.

Thus do I view the parties to these agreements at the time the agreements were made and executed. Having in mind the condition and relations of the parties, and particularly the physical and mental feebleness of Mr. Hicks at the time that these agreements were entered into, it seems to me that the defendant should have advised the decedent against entering into such agreements. He should not have entered into such agreements himself, and he should have prevented, if he could, the decedent from entering into such contracts with another. It was apparent, as indicated by the testimony, that the aged man had but a few years to live, and it did not require much calculation to ascertain the great benefits one could obtain by entering into the annuity contracts under the circumstances, when it was reasonably certain, from the physical condition of the decedent, that the person entering into such a contract with him would not have long to wait before becoming possessed of the money, without having to pay very much therefrom.

The question is: Did the decedent fully and clearly understand the terms of these annuity contracts, the disposal he was making of his property, and the benefits he was receiving in return, in view of his own physical condition, and was it his voluntary act, and did he understand the full import of such contracts? I do not think he did. The contracts of annuity entered into by the defendant with the decedent were unfair and unconscionable, in view of the decedent's condition at the

time they were executed. The defendant's relation to the decedent was that of a friend and confidential adviser, and he possessed a mind so far superior to that of the decedent that they did not deal on terms ·of equality. The defendant had a superior knowledge to that of the ·decedent, and through the decedent's weakness and infirmity of mind and body, of which defendant· was cognizant, decedent depended a great deal on the defendant, advised with him, and reposed his trust in him, and this trust was taken advantage of by the defendant, who advised him to enter into these annuity contracts. The decedent did not exercise a deliberate judgment, and he was imposed upon by the superior knowledge possessed by the defendant and the undue influence which he had and exercised over the decedent. The fact is clearly ·established by the evidence that the relations of the defendant and the decedent were such that the decedent reposed great confidence in the ·defendant. He was not only his confidential adviser, but a close friend, and he believed in and relied upon the defendant. Under such ·circumstances it is well settled by a long line of authorities that the transactions between them will be scrutinized with extreme vigilance. "Where the relation between· the parties is that of parent and child, principal and agent, or where one party is situated so as to exercise a controlling influence over the will and conduct of another, transactions between them are scrutinized with extreme vigilance, and clear ·evidence is required that the transaction was understood, and that there was no fraud, mistake, or undue influence. Where those relations ·exist, there must be clear proof of the integrity and fairness of the transaction, or any instrument thus obtained will be set aside or held as invalid between the parties." Ten Eyck v. Whitbeck, 156 N. Y. ·353, 50 N. E. 963; Hunter v. McCammon, 104 N. Y. Supp. 402.

In the case of Green et al. v. Roworth et al., 113 N. Y. 471, 21 N. E. 165, Chief Justice Ruger states the· rule to be, in quoting from ·Story's Equity Jurisprudence, § 238:·

"The doctrine, therefore, may be laid down as generally true that the acts and contracts of persons who are of weak understanding, and who are, therefore, liable to imposition, will be held void in courts of equity, if the nature of the act or contract justify the conclusion that the party has not ex- ·ercised a deliberate judgment, but that he has been imposed upon, circumvented, or overcome by cunning or artifice, or undue influence."

"Every contract must be fair—that is, it must be free from deceit, fraud, ·or misrepresentation practiced by one of the contracting parties upon the other; and whenever a court of equity can see that undue and unconscionable advantage has been taken by one of the parties, by reason of a confi- ·dential relation existing between them at the time the contract was made, or that they did not then deal upon a plane of equality by reason of the facts stat- ·ed, it never hesitates to exercise its equitable powers to enforce a right or to ·prevent the consummation of a wrong." Sheehan v. Erbe, 77 App. Div. 180, 79 N. Y. Supp. 43.

Mr. Justice Hatch, in Rosevear v. Sullivan, 47 App. Div. 423, 62 N. Y. Supp. 449, said:

"Where it is claimed that one party is dependent upon the other, and such a relation existed as precludes the idea that they dealt upon terms of equality, the appearance of the parties themselves oftentimes furnishes the strongest and most conclusive evidence of the fact. We have before observed that the testimony in this case strongly indicates feebleness and wavering upon one ·side and comparative strength upon the other. Under such circumstances

the controlling factor in determining whether that quality which the law requires exists or not is the appearance of the parties themselves. In the present case the court has stated in terms that the appearance of the parties is the convincing fact which controlled its judgment. There is, therefore, presented a case of a class where the facts which are controlling with the court are impossible of transmission to an appellate tribunal, which deals alone with a printed record. Scarcely a shadow of the controlling fact governing the action of the learned court below is now before us, and we are required to give force and effect to such consideration."

It was said by Judge Hand, in Cowee v. Cornell et al., 75 N. Y. 99, 31 Am. Rep. 428:

"We return, then, to the question whether this case was one of constructive fraud. It may be stated as universally true that fraud vitiates all contracts; but as a general thing it is not presumed, but must be proved by the party seeking to relieve himself from an obligation on that ground. Whenever, however, the relations between the contracting parties appear to be of such a character as to render it certain that they do not deal on terms of equality, but that either on the one side from superior knowledge of the matter derived from a fiduciary relation, or from overmastering influence, or on the other from weakness, dependence, or trust justifiably reposed, unfair advantage in a transaction is rendered probable, there the burden is shifted, the transaction is presumed void, and it is incumbent upon the stronger party to show affirmatively that no deception was practiced, no undue influence was used, and that all was fair, open, voluntary, and well-understood."

In the case of Dolan v. Cummings, 116 App. Div. 788, 102 N. Y. Supp. 92, Mr. Justice Rich says:

"That fact brings the case clearly within the rules, declared by the Court of Appeals to be well settled, that whenever the relations between the contracting parties appear to be of such a character as to render it certain that they do not deal on terms of equality, but that either on the one side from superior knowledge of the matters derived from a fiduciary relation, or on the other from dependence or trust justifiably reposed, unfair advantage is rendered probable, the transaction is presumed void, and it is incumbent upon the stronger party to show affirmatively that no deception was practiced and that all was open, fair, and understood. Cowee v. Cornell, 75 N. Y. 91, 99, 31 Am. Rep. 428. This burden the defendant did not sustain."

The plaintiffs in this case have not asked that this burden be shifted, but have assumed the burden, and, I think, sustained it by ample proof. They have not only shown decedent's ignorance of business affairs and his lack of advice by an attorney or any person, other than the defendant, the mental and physical weakness of decedent, and the existence of dependent and fiduciary relations, upon which the law presumes confidence to rest and influence to be exerted; but they have also shown that influence was actually exerted, and they have shown acts and conduct upon the part of defendant relating to the matter which under all the circumstances are in law fraudulent. The witness Mrs. Lambert, called by the plaintiffs, was for many years a housekeeper for Mr. Hicks. She testified to a conversation between herself, Mr. Hicks, and Mr. Waterman a few days before the first agreement was executed. She testified:

"Mr. Waterman said: 'I want Mr. Hicks to have more money. I want him to have more, so he can have a carriage, and go out riding.' And Mr. Hicks didn't know about that, and I said: 'Why don't he use his money?' And Mr. Waterman said: 'If he used his money, he would soon not have any; and if he drew his money from the rents, there would be no money to draw from.' And Mr. Hicks said he didn't know what else to do. And Mr. Waterman said

104 N.Y.S.—44

he didn't know, unless he had an annuity. He said he had money in the bank, and he could get a trust company to take that and give him an annuity. Then Mr. Hicks wanted to know what an annuity was, and Mr. Waterman explained to him, and Mr. Hicks asked him how he could do that, and Mr. Waterman said he could get a trust company, or he would take it and give him a certain per cent. I think he said he would get 1 per cent. more than he got in the bank for his money. And Mr. Hicks thought it over, and rather waited. I don't know how much he thought, but he waited, and said he didn't know of any other way, and Mr. Waterman said, if he had to keep drawing his money out, and there was no fund, he would have to mortgage the estate, and Mr. Hicks said he wouldn't do that. That frightened him."

No man in the feeble physical condition of Mr. Hicks, if he possessed ordinary common sense, would enter into annuity agreements like the ones in suit. They were neither fair nor sensible contracts to be entered into by a man in his feeble physical condition. Mr. Waterman knew they were not, and it was wrong in him to propose to Mr. Hicks that he should make the agreements. The foregoing statements made by Mr. Waterman to Mr. Hicks did not truthfully represent the financial condition and needs of Mr. Hicks, and Mr. Waterman knew they did not. Mr. Waterman also had the benefit and advice of his own attorney, while Mr. Hicks had no attorney; neither did he have the advice of any person competent to give advice upon the subject-matter, but he trusted and relied upon Mr. Waterman, and this was known to Mr. Waterman. The only person who seems to have had any knowledge of the execution of these papers before the death of Mr. Hicks, who was in any way connected with Mr. Hicks (besides Mr. Waterman), was the housekeeper, Mrs. Lambert. The witnesses to the papers were Mrs. Lambert and a clerk in the employ of Mr. Waterman, who was taken to Mr. Hicks' house by Mr. Waterman.

The learned counsel for the defendant claims that Mrs. Lambert is prejudiced against the defendant, and that her evidence is not entitled to credit. The appearance of the witness, however, and her manner, impressed me favorably. She was carefully cross-examined at great length by counsel for the defendant, and the evidence given upon her direct examination remained unshaken in all substantial parts. I am satisfied that she told the truth upon the stand.

The learned counsel for defendant places reliance on the case of Kelly v. Ashforth, 47 Misc. Rep. 499, 95 N. Y. Supp. 1004. This was an action to set aside a trust deed. In that case Mr. Justice Leventritt, writing the opinion, at page 505 of 47 Misc. Rep., page 1008 of 95 N. Y. Supp., states:

"But the question is: Did Kelly fully and clearly understand the terms of the deed of trust, the disposition that he was thereby making of his property, and who was getting the benefit of it; and, above all, did it express his voluntary intention? Though 69 years of age, there is no suggestion of impairment of mental powers. In fact, I am convinced that he thoroughly comprehended the scheme of the trust deed, and that it accorded with his purposes and wishes."

In that case the learned justice sustained the making of the trust deed, but he stated "that there is no suggestion of impairment of mental powers." Clearly that case is not analogous to the case at bar, for it is shown in this case that the 14 years of suffering and the

palsied condition of the decedent had made great inroads on his physical and mental powers, and there are other facts in the above-cited case which distinguish it from the case now under consideration.

The learned counsel for the defendant places great stress upon the fact that the decedent made and executed a will, which was admitted to probate, and in which it is conceded that the decedent made a just disposal of his property. There is a clear distinction between this case and the case of a person who is either weak of mind or an imbecile making a will. Imbecility is not a disqualification for making a will, provided the testator has the capacity which the law requires, as has been clearly stated by Mr. Justice Woodward in McGowan v. Underhill, 115 App. Div. 642, 101 N. Y. Supp. 316:

"An imbecile is neither a lunatic nor an idiot. He is defined 'as one destitute of strength, either of body or mind; one who is weak, feeble, impotent, decrepit. Imbecility is defined as the quality of being imbecile; feebleness of body or mind.' 15 Am. & Eng. Ency. of Law (2d Ed.) 1019. It is not a word of exact meaning, and imbecility is not a disqualification for making a will, provided the testator has the capacity which the law requires; and that is not determined by any mere generalization of the testator's capacity, but is to be determined from his acts in reference to the particular business in hand."

"Imbecility, as distinguished from idiocy or lunacy, is usually incident to extreme age, and is generally the result of a gradual decay of the mental faculties." Messenger v. Bliss, 35 Ohio St. 587, 592; 22 Cyc. 1112.

Even a lunatic can make a will during a lucid interval. "Although an inquisition finding a man a lunatic is prima facie evidence of lunacy during the whole period covered by the inquisition, yet it does not preclude the valid execution of a will or any other act during a lucid interval. If an intermission of the malady is shown, general, habitual, insanity will not affect it." Jarman on Wills, 37. The contracts should be set aside and adjudged to be null and void.

There is no dispute about the amount of money received by Mr. Waterman or the time when he received it. He paid the amounts called for by the contracts to Mr. Hicks down to the time of his death. So it is not necessary to have an account taken. Mr. Waterman is chargeable with the amount received from Mr. Hicks, with interest from the time he received the moneys, and is to be credited with the payments made each month, according to the rules for computation in such cases.

Judgment is directed, accordingly, for plaintiffs, with costs.