466 S.E.2d 542

**Mark E. MORTON, Executor of the Estate of Joseph R. Fitzpatrick, Plaintiff Below, Appellant,**

**v.**

**AMOS–LEE SECURITIES, INC., a Corporation; Richard L. Keagy, an Individual; and the Equitable Life Assurance Society of the United States, a Corporation, Defendants Below, Appellees.**

No. 22873.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 26, 1995.

Decided Dec. 14, 1995.

**692**

J. Michael Ranson, Cynthia M. Salmons, William W. Smith, Charleston, for Appellant.

John M. Slack, III, Michael T. Cimino, Jackson & Kelly, Charleston, for Equitable.

RECHT, Justice:

## INTRODUCTION

The appellant, Mark E. Morton, Executor of the Estate of Joseph R. Fitzpatrick, appeals a summary judgment entered by the Circuit Court of Kanawha County which held that there were no genuine issues of material fact and that from the pleadings, exhibits, memoranda and supporting documents, The Equitable Life Assurance Society of the United States (herein "Equitable") was entitled as a matter of law to judgment in its favor. Because we find, after reviewing the entire record, genuine issues of material fact exist that would support at least one of the legal theories of recovery advanced by the appellant, we reverse.

## FACTS [1]

The appellant's decedent, Joseph R. Fitzpatrick, was by trade a salesman employed by a Charleston men's clothing store. Mr. Fitzpatrick had no background, training, education or experience in the world of acquisition, trading and sale of securities or other financial products. In the parlance of the investment community, he was an "unsophisticated investor."

In 1984, Mr. Fitzpatrick had the good fortune of inheriting a portfolio of investment grade securities with a market value of approximately $108,000. Lacking any understanding as to how to manage this windfall, Mr. Fitzpatrick sought, upon the recommendation of a friend, investment counselling and advice from Richard Keagy, an employee of Amos–Lee Securities, Inc. (herein "Amos–Lee").[2]

As time progressed and with the advice of Mr. Keagy, Mr. Fitzpatrick liquidated his entire portfolio, producing a sum of money in the amount of approximately $116,000. The conversion of the stock to cash was completed in early 1987.

During the period that Mr. Fitzpatrick was liquidating his inherited portfolio, he was admitted as an in-patient in a Charleston area hospital for an alcohol detoxification program. The period of hospitalization was January 23, 1987, through February 20, 1987. Mr. Fitzpatrick's discharge records reveal

---

1. This factual recitation is a combination of undisputed and disputed facts as gleaned from the record which includes pleadings, interrogatories, affidavits, depositions and documents. As we proceed through a factual analysis we will differentiate between undisputed and disputed facts.

2. Mr. Keagy and Amos–Lee are named defendants and were not included in the summary judgment granted to the defendant Equitable. Presumably, the civil action against these defendants continues.

that he was diagnosed with "[m]ajor depressive disorder, recurrent" and "[c]hronic alcoholism."

Following Mr. Fitzpatrick's discharge from the detoxification program, he sought the advice of Mr. Keagy as to how to invest this sum of money in such a manner as to produce a stable monthly income to supplement his earnings as a clothing salesman.[3]

On April 27, 1987, Mr. Fitzpatrick and Mr. Keagy met to consider an investment plan. Mr. Keagy recommended the purchase of a single-premium whole life insurance policy through Equitable. The investment scheme associated with the purchase of this type of life insurance would have enabled Mr. Fitzpatrick to borrow against the policy to obtain income during his lifetime and the balance due on the policy at the time of death would have been paid to a designated beneficiary. It was necessary for Mr. Fitzpatrick to complete an application on an Equitable form to determine his eligibility to purchase this type of policy. During the process of completing the form, Mr. Fitzpatrick informed Mr. Keagy that he had recently been discharged from an alcohol detoxification program. Upon receiving this information, Mr. Keagy contacted an unnamed individual at Equitable to determine whether Mr. Fitzpatrick's alcoholism would disqualify him from purchasing this type of policy. Mr. Keagy testified in a deposition that he was informed by

Equitable that Mr. Fitzpatrick's alcoholism would disqualify him from purchasing this type of policy.[4]

Undaunted, Mr. Keagy persisted in his attempt to sell Mr. Fitzpatrick some sort of financial product with the $116,000 that was at Mr. Keagy's disposal. Mr. Keagy then suggested that Mr. Fitzpatrick take out a single-premium whole life insurance policy on the life of a relative and Mr. Fitzpatrick's niece was suggested. Mr. Keagy informed Mr. Fitzpatrick that this scheme would generate approximately $715 per month, which convinced Mr. Fitzpatrick on April 27, 1987, to deliver $116,000 for the policy. Mr. Fitzpatrick's niece was required to undergo a physical examination in connection with the insurance application.

On May 27, 1987, in a meeting at the office of Joseph Funderburk, Equitable's agency manager in West Virginia, Mr. Fitzpatrick informed Mr. Keagy and Mr. Funderburk that he had changed his mind in regard to purchasing this life insurance policy on the life of his niece and he asked both Mr. Keagy and Mr. Funderburk for additional investment alternatives that would generate a stable monthly income.[5] In response to this request, Mr. Keagy and Mr. Funderburk recommended that Mr. Fitzpatrick purchase an annuity. Mr. Funderburk discussed four types of annuities, including a life annuity[6]

3. The appellants contend that Mr. Fitzpatrick's investment strategy was to generate as much monthly income as possible, yet protecting and preserving the corpus of the fund for distribution to his sister upon his death. The defendant Equitable disputes this contention and instead takes the position that Mr. Fitzpatrick's only investment strategy was to generate as much monthly income as possible without any concern for the distribution of the corpus upon his death. This is but one of many genuine issues of material fact which militates against the granting of summary judgment.

4. Specifically, Mr. Keagy says Equitable informed him that at least five years must have elapsed following treatment for alcoholism before a person could qualify for this type of life insurance policy. Joseph Funderburk, an Equitable agent, testified that it is Equitable's policy that at least seven years must have elapsed since the treatment of alcoholism before the issuance of this type of life insurance.

5. Equitable contends that Mr. Fitzpatrick chose not to purchase the life insurance policy on the life of his niece because a monthly income of $715 was inadequate and he did not want to leave any money upon his death. This contention is disputed by the appellant through the testimony of Mr. Fitzpatrick's sister, to the extent that she was informed by Mr. Fitzpatrick that she would never have to worry about money upon his death. The testimony of the decedent's sister would not be inadmissible under the West Virginia Dead Man's Statute. W.Va.Code 57-3-1 (1937); *Martin v. Smith*, 190 W.Va. 286, 438 S.E.2d 318 (1993).

6. This life annuity provided for a monthly payment of $1,083.50. A life annuity is one which "[p]rovides for payment of income to annuitant only during his lifetime; even though death is premature." *Black's Law Dictionary* 90 (6th ed. 1990).

and three types of refund annuities.[7]

In an effort to explain these various types of annuities to this unsophisticated investor, Mr. Funderburk produced a mortality table describing various monthly payments for a male whose date of birth was June 18, 1920, which was Mr. Fitzpatrick's date of birth.

It is significant to note that during the time preceding the selection by Mr. Fitzpatrick of any of the annuity options, Mr. Funderburk had actual knowledge that Mr. Fitzpatrick had been rejected for life insurance by Equitable because of Mr. Fitzpatrick's alcoholism. Specifically, Mr. Funderburk testified at a deposition on September 20, 1993, as follows:

Q. Did you know that [Mr. Fitzpatrick] had been turned down for life insurance by The Equitable?

A. Yes, I did.

Q. How did you know that?

A. I just knew that he was. I don't remember—I didn't have anything to do with the application or anything but I knew that he was turned down.

Q. You just don't recall how you knew that?

A. No. I'm sure that he told me or—

Q. Mr. Keagy may have told you?

A. Yes.

Q. Do you know why he was turned down?

A. Alcoholism.

Q. Do you know what alcoholism has to do with being turned down for life insurance with Equitable?

A. Yes.

Q. What does it have to do with it?

A. Anytime anyone has a prior history of alcoholism, you have to wait seven years before you are insurable again.

Q. Do you know why that is?

A. Well, they just want to make sure that the people stay off of the alcohol.

Q. Why is that?

A. Well, because if you go back on, it's going to be detrimental to your health.

Q. Did you ever recommend to Mr. Fitzpatrick that he have a physical prior to buying this annuity?

A. Why would I do that?

Q. I don't know. I'm just asking you if you did.

A. No.

Q. You don't have to have a physical to buy an annuity; is that correct?

A. That is correct.

During the May 27, 1987 meeting, Mr. Fitzpatrick chose the life annuity from the various annuity options and authorized the release of the $116,000 for the purchase of the life annuity that paid a monthly income of $1,083.50 for the remainder of his life.

In March 1988, Mr. Fitzpatrick was diagnosed with throat cancer. In May 1988, Mr. Fitzpatrick executed a new will, replacing his sister as executrix and beneficiary of his estate, with the appellant Mark Morton, the chief financial officer at his employment, as executor, and his sister as the primary beneficiary. Mr. Fitzpatrick died on November 5, 1988.[8]

---

7. The other optional annuities, included a "Life Refund Certain Annuity" (providing for a $1,026.73 monthly payment); a "Life 10 Year Minimum Payments" (providing for a $1,005.94 monthly payment); and a "Life 20 Year Minimum Payments" (providing for a $905.65 monthly payment).

A refund annuity provides that an "[a]nnuitant is assured a specified annual sum during his life with the further assurance that in the event of his premature death there will be paid to his estate an additional amount which represents the difference between the purchase price and the amount paid out during annuitant's life."

*Black's Law Dictionary* 90 (6th ed. 1990). As their titles suggest, a 10 year minimum payment guarantees a minimum of ten years worth of payments and a 20 year minimum payment guarantees a minimum of 20 years worth of payments.

8. The appellant maintains that Mr. Fitzpatrick died of throat cancer, related to his alcoholism. The death certificate lists the cause of death as "cardiorespiratory arrest," "extreme cachexia" (the wasting away of the body) and "metastatic squamous cell carcinoma of pharynx" (throat cancer).

## THEORIES OF RECOVERY AGAINST EQUITABLE

As we harvest the pleadings, the appellant's theories of recovery include misrepresentation and fraud, breach of the duty of good faith and fair dealing, and a violation of the West Virginia Unfair Trade Practices Act (herein "WVUTPA"), W.Va.Code 33–11–4(1)(a) (1985).

The underpinnings to support these separate theories flow from a common set of facts: [9]

1. That prior to the sale of the life annuity, Equitable had actual knowledge that Mr. Fitzpatrick was a 67–year–old male with a history of alcoholism which was detrimental to his health (undisputed); [10]

2. That prior to the sale of the life annuity, Equitable had actual knowledge that Mr. Fitzpatrick was a novice or "unsophisticated investor" (disputed);

3. That prior to the sale of the life annuity, Equitable knew that Mr. Fitzpatrick had to live at least ten years to recover the principal (undisputed);

4. That Equitable knew that there was a strong likelihood that a person of Mr. Fitzpatrick's age and health was unlikely to live for a sufficient period of time to make a life annuity a worthwhile investment, in that he only had a life expectancy of 1.8 years (disputed); [11]

5. That Mr. Fitzpatrick's investment strategy was to apply the $116,000 in such a manner as to produce the maximum monthly income and yet preserve some portion for his estate (disputed);

6. That any variety of a refund annuity would have fulfilled Mr. Fitzpatrick's investment goals but were not recommended because Equitable was more interested in maximizing its return as opposed to satisfying Mr. Fitzpatrick's investment strategy (disputed).

We now must analyze to what extent this series of both disputed and undisputed facts support one or more of the appellant's theories of recovery. The circuit court did not, in considering the motion for summary judgment, touch upon the availability of a theory of recovery under WVUTPA. Our analysis of the structure of this case at this juncture in the proceedings is that an alleged violation of WVUTPA deserves most of our attention.

## WEST VIRGINIA UNFAIR TRADE PRACTICES ACT

■ We address, as a question of first impression, whether a private cause of action exists to enforce the West Virginia Unfair Trade Practices Act, and specifically that portion of the Act proscribing the misrepresentation and false advertising of insurance policies within W.Va.Code 33–11–4(1)(a) (1985).[12]

We have on prior occasions recognized private causes of action under WVUTPA in *Jenkins v. J.C. Penney Casualty Ins. Co.*, 167 W.Va. 597, 280 S.E.2d 252 (1981), *overruled on other grounds by State ex rel. State Farm Fire & Casualty v. Madden*, 192 W.Va. 155, 451 S.E.2d 721 (1994). *Jenkins* held that a private cause of action under W.Va.Code 33–11–4(9) may be brought against an insurance company for failing to

---

9. *See* Syllabus Point 6, *Ilosky v. Michelin Tire Corp.*, 172 W.Va. 435, 307 S.E.2d 603 (1983) (holding that product liability actions may be premised on three independent theories—strict liability, negligence, and warranty).

10. Equitable attempts to exculpate its conduct by shifting responsibility to Mr. Keagy and Amos–Lee, asserting that Mr. Keagy and Amos–Lee are not agents of Equitable, but are instead brokers for which Equitable is not responsible. *See* W.Va.Code 33–1–12, –1–14, –12–23 (1957). This record contains sufficient genuine issues of material facts which support Equitable's vicarious liability through the actual knowledge of the age and health of Mr. Fitzpatrick by Mr. Funderburk, its agent.

11. The appellant's expert witness testified that in his opinion Mr. Fitzpatrick had a life expectancy of about 1.8 years at the time the annuity was purchased.

12. W.Va.Code 33–11–4(1)(a) (1985) defines unfair methods or deceptive acts or practices in the business of insurance to include, *"Misrepresentation and false advertising of insurance policies.—* No person shall make, issue, circulate, or cause to be made, issued or circulated, any estimate, circular, statement, sales presentation, omission or comparison which: Misrepresents the benefits, advantages, conditions or terms of any insurance policy ..."

attempt in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear. *Id.* In *Mutafis v. Erie Ins. Exch.*, 174 W.Va. 660, 328 S.E.2d 675 (1985), we held that a private cause of action under W.Va.Code 33–11–4(3), (5) (1974), may be brought for defamation and false statements made regarding business and financial conditions.

In Syllabus Point 1 of *Hurley v. Allied Chem. Corp.*, 164 W.Va. 268, 262 S.E.2d 757 (1980), we set forth the guidelines for determining whether violation of a statute gives rise to a private cause of action. That syllabus point provides:

> The following is the appropriate test to determine when a State statute gives rise by implication to a private cause of action: (1) the plaintiff must be a member of the class for whose benefit the statute was enacted; (2) consideration must be given to legislative intent, express or implied, to determine whether a private cause of action was intended; (3) an analysis must be made of whether a private cause of action is consistent with the underlying purposes of the legislative scheme; and (4) such private cause of action must not intrude into an area delegated exclusively to the federal government.

*Id.*

■ The *Hurley* test is met in the case before us because: Mr. Fitzpatrick was a member of the class of persons who was entitled to the benefits, advantages, conditions or terms of an annuity; the Legislature obviously intended that the statute have some meaning, and it is inconceivable how the statute would be enforced without a private cause of action; there is no rational basis to believe that a private cause of action is in any way inconsistent with the purposes of the legislative scheme; and the federal government has not preempted this area of law. We need not encumber this opinion with additional analysis as to why a private cause of action exists in the case *sub judice*, beyond what is contained in the seminal opinion in *Jenkins v. J.C. Penney Casualty Ins. Co.*, 167 W.Va. 597, 280 S.E.2d 252 (1981).

We hold that there is a private cause of action for a violation of W.Va.Code 33–11–4(1)(a) (1985), of the West Virginia Unfair Trade Practices Act.[13]

## APPROPRIATENESS OF SUMMARY JUDGMENT

Having established that a private cause of action exists for violation of W.Va.Code 33–11–4(1)(a) (1985), we must now analyze whether or not there are, in the record before us, sufficient genuine issues of fact to support a cause of action under this statutory provision.

■ We remind that our review of the granting of summary judgment is de novo. Syllabus Point 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). We have also defined when a genuine issue of fact exists:

> Roughly stated, a "genuine issue" for purposes of West Virginia Rule of Civil Procedure 56(c) is simply one half of a trialworthy issue, and a genuine issue does not arise unless there is sufficient evidence favoring the non-moving party for a reasonable jury to return a verdict for that party. The opposing half of a trialworthy issue is present where the non-moving party can point to one or more disputed "material" facts. A material fact is one that has the capacity to sway the outcome of the litigation under the applicable law.

Syllabus Point 5, *Jividen v. Law*, 194 W.Va. 705, 461 S.E.2d 451 (1995).

■ We have, in our prior discussion, described a series of at least six genuine factual issues upon which a reasonable jury might return a verdict in the appellant's favor under WVUTPA. Certainly all of the facts, disputed or undisputed, are material in that each has the capacity to sway the outcome of this litigation under WVUTPA.

Each of these material facts provides the context for the sales presentation of the life annuity. A reasonable jury could conclude that Equitable, armed with the knowledge as to Mr. Fitzpatrick's age and failing health, misrepresented the benefits and advantages of a lifetime annuity to the extent that he

---

13. The question may be asked as to whether an annuity is an insurance policy under WVUTPA. That question is quickly answered in W.Va.Code 33–1–10 (1986), wherein the definition of life insurance includes annuities.

would not likely live long enough to enjoy the full benefits of this investment so that the only party benefiting would be the insurance company. A reasonable jury could also conclude that Equitable misrepresented a life annuity to the exclusion of a refund annuity, which would have been more consistent with Mr. Fitzpatrick's investment strategy of a stable monthly income and preservation of some portion of his investment for his estate.

We note that the circuit court found that the essential facts were undisputed. As we have demonstrated, there are genuine issues for trial and apparently the circuit court, in concluding that there were no genuine issues for trial, weighed the evidence and determined the truth of matters contrary to our instruction in *Painter v. Peavy*, "[t]he circuit court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but is to determine whether there is a genuine issue for trial." Syllabus Point 3, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). We conclude that summary judgment is not appropriate upon this record because when it is taken as a whole, it could lead a rational trier of fact to find in favor of the appellant as the non-moving party.[14] Our analysis of the facts persuades us that there is sufficient evidence favorable to the appellant, as the non-moving party, for a reasonable jury to return a verdict for that party. Upon the record taken as a whole, the appellant, as the non-moving party, has not failed to make a sufficient showing on the essential elements of proving a violation of WVUTPA, W.Va. Code 33–11–4(1)(a) (1985). We come to this conclusion without further comment upon the theory of fraud and misrepresentation, which we conclude is supported by the same material issues of fact that carry this case to the jury on the theory of WVUTPA.[15]

## CONCLUSION

The judgment of the Circuit Court of Kanawha County, granting summary judgment in favor of The Equitable Life Assurance Society of the United States, is hereby reversed and this case is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

MILLER, Retired J., sitting by temporary assignment.

WORKMAN, J., deeming herself disqualified, did not participate.

ALBRIGHT, J., did not participate.

14. We recognize that there are other jurisdictions that would consider life annuities, on similar facts, to be unfair and unconscionable, and therefore void as a matter of law. *Barnes v. Waterman*, 54 Misc. 392, 104 N.Y.S. 685 (1907), aff'd 114 N.Y.S. 1118 (N.Y.A.D. 2 Dept.1908); *see also Rishel v. Pacific Mut. Life Ins. Co.*, 78 F.2d 881, 887 (10th Cir.1935). This record, however, does not have a sufficient factual composition for this Court to determine whether under the facts and circumstances this life annuity would be void as a matter of law.

15. The appellant also asserts a theory of recovery based upon a breach of a duty of good faith and fair dealing. For the reasons recited, we are reversing the circuit court and remanding this

case for a trial on the merits. There is no reason to discuss in this opinion whether such a duty exists between an insurer and a prospective insured during the negotiation phase of a transaction. This is not the typical case where the covenant of good faith and fair dealing arises after the execution of a contract. *See Weese v. Nationwide Ins. Co.*, 879 F.2d 115 (4th Cir.1989). Instead, the appellant urges that a duty exists in the negotiation stage. We are not foreclosing the appellant from pressing this theory on remand and would recommend further research on this issue to assist the trial court. *See* Nicola W. Palmieri, *Good Faith Disclosures Required During Precontractual Negotiations*, 24 Seton Hall L.Rev. 70 (1993).