475 S.E.2d 10

**Leslie O. DAWSON, Plaintiff Below, Appellee,**

v.

**NORFOLK AND WESTERN RAILWAY CO., Defendant and Third Party Plaintiff Below, Appellant.**

**Doug E. COLLINS and Mark S. Hatfield, d/b/a Eagle Trucking Co., Defendants Below, Appellees,**

v.

**PEN COAL CORPORATION, Third Party Defendant Below, Appellee.**

No. 22901.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 23, 1996.

Decided May 16, 1996.

Marc E. Williams, Robert L. Massie, Huddleston, Bolen, Beatty, Porter & Copen, Huntington, for Norfolk and Western Railway Co.

D.C. Offutt, Jr., Scott W. Andrews, Offutt, Eifert, Fisher, Duffield & Nord, Huntington, for Pen Coal Corporation.

PER CURIAM:

Norfolk and Western Railway Company appeals a summary judgment order of the Circuit Court of Wayne County dismissing

its third party complaint against Pen Coal Corporation. On appeal, the railway asserts that material issues concerning the responsibility for the underlying October 8, 1991 accident between a train and a coal truck preclude the granting of summary judgment. Because our examination of the record shows unresolved questions of responsibility created by disputed material facts, we reverse the order of the circuit court and remand the case for further proceedings.

## I.

## BACKGROUND

Although the underlying accident did not occur until 1991, the relationship between the railway and Pen Coal Corporation (hereinafter Pen) began when P & C "Bituminous Coal," Inc., a predecessor of Pen, purchased property adjacent to U.S. Route 52 in Wayne County, West Virginia for a coal processing plant. Access from U.S. Route 52 to Pen's property requires crossing a heavily used double track of the railway. When Pen purchased the property, the crossing to access the property was suitable for a small, private farm. Because the existing crossing was too narrow for Pen's purposes, numerous improvements, including widening of the crossing and placing of automatic gates and lights, were needed to upgrade the crossing.

On March 3, 1988, the railway and Pen entered an agreement concerning the parties' respective responsibilities concerning the crossing (hereinafter the agreement). The agreement provided that in return for the payment of a nominal annual fee, the railway granted Pen "permission and license to upgrade, maintain and use said crossing...." Under the agreement, Pen would pay for upgrading the crossing with "[a]ll work ... performed, at the option of [the] Railway." Although the maintenance of the crossing was under the railway's supervision, the rail-

way's maintenance did "not relieve Licensee [Pen] of any liabilities and responsibilities" assumed under the agreement. In section 3 of the agreement, Pen agreed that neither it nor any one using the crossing under Pen's license would block the crossing or "in any manner interfere with the free and uninterrupted use by the Railway of its right-of-way and railroad track(s)," and in section 5, Pen agreed to "require all vehicles about to use said crossing(s) to come to a full stop before crossing and not proceed until the way is clear and safe." Under section 7 of the agreement, Pen agreed to indemnify the railroad for any damages arising out of the license "unless [ (1) ] such cause is the result of the sole negligence of the Railway ..., or [ (2) ] the result of the joint negligence of the Railway and an independent third party in which the Licensee [Pen] did not contribute...." [1] Section 8 of the agreement required Pen to have comprehensive general liability insurance.

At the time of the accident, the crossing was equipped with a warning sign and automatic flashing lights, bells and gates. The parties agree that these warning devices were functioning at the time of the accident. *Because of the plant's unique configuration, the usual traffic pattern of driving on the right side of a road was reversed by Pen for crossing the railway's tracks; that is, vehicles entered the plant on the left side and exited on the left side of the crossing.* For about the first year of Pen's plant operation, a normal right side traffic pattern was used at the crossing; however, because of Pen's plant expansion, vehicles were required to use the left side of the crossing to enter and exit the plant. The railway installed the warning gates when the normal right side traffic pattern was followed. Thus the crossing's automatic gates, designed for normal traffic patterns, descended and blocked the

1. In its entirety, section 7 of the agreement states:

Licensee agrees to indemnify and save harmless Railway, its officers, agents and employees, its parent, subsidiary and affiliated companies and their officers, agents and employees, from and against any and all loss, damage, claims, expenses, judgments and/or liability for personal injury (including death) and/or prop-

erty damage to whomsoever or whatsoever occurring, regardless of the cause thereof, *unless such cause is the result of the sole negligence of Railway, its officers, agents, or employees, or the result of the joint negligence of Railway and an independent third party in which the Licensee did not contribute, arising out of the exercise of the privileges herein allowed.* [Emphasis added.]

right side of the crossing even through traffic had to approach Pen's plant from the left; neither did the automatic gates extend over the entire crossing.

According to James Beckley, dock manager for Pen, sometime in 1990, the railway contacted Pen because a "few" of the gates arms were getting broken requiring the railway to make repairs or readjust the gates. In response to the railway's concerns, Pen posted an additional sign on the right side of the road stating "Do not cross tracks when gates are down." On January 10, 1990, Pen also drafted and circulated a notice imposing penalties on drivers and their companies for violating crossing rules. However, Pen did not send this notice to Mark Hatfield, the owner of the trucking company involved in the underlying accident.

On October 8, 1991, an accident occurred at the Pen crossing involving a locomotive owned by the railway and operated by Leslie O. Dawson, an engineer employed by the railway and the plaintiff in the case below, and a coal truck owned by Mark S. Hatfield d/b/a Eagle Trucking Company and operated by Doug E. Collins. Although there is some disagreement about the circumstances leading to the accident, the parties agree that the locomotive struck the rear of the truck. Mr. Dawson and Michael Smith were in the lead locomotive and both were injured in the accident.[2] Two other railway employees riding in the second locomotive and Mr. Collins were not injured. The train, which originated in Williamson, consisted of three locomotives, about twelve loaded rail cars and about one hundred thirteen empty rail cars. Immediately before the accident, the train was traveling in a northerly direction at about forty miles per hour on the track nearest to U.S. Route 52. The train's headlight was on at its brightest setting, and because the track around Pen's crossing is straight, the railway employees had a clear view of the crossing. When the train was approximately 2,000 feet from the crossing, Mr. Dawson saw the coal truck and began sounding the train's whistle and bell.

The fully loaded coal truck driven by Mr. Collins was travelling in a northerly direction along U.S. Route 52. Before turning left to go into Pen's plant, the coal truck pulled onto the right berm of U.S. Route 52 where Mr. Collins removed the truck's tarp covering. Mr. Collins then proceeded to turn left, crossing U.S. Route 52 toward Pen's plant. There is conflicting testimony about the circumstances immediately before the accident. Mr. Collins testified that he did not stop before crossing the tracks or look for a train, but was in constant motion from when he removed the tarp until he was struck by the train. Mr. Collins testified that no warning occurred until he got his tractor on the tracks and "I knowed [sic] then to go on because I couldn't stop and back up."

Mr. Dawson, the train's engineer, testified that he first saw the truck when it was turning off U.S. Route 52 into Pen's plant. Mr. Dawson said when the truck got to the crossing "it looked like he stopped" and the automatic gate was either down or descending. Apparently there is sufficient room for a coal truck to stop at an angle before the crossing without blocking either U.S. Route 52 or the tracks.

Mr. Dawson said the truck only stopped for a few seconds and then went around the gate. Mr. Dawson estimated that when the truck went around the gate, the train was 1500 feet away. Mr. Dawson said the truck briefly stopped again "[r]ight at the rail" and then proceeded on to the track. Mr. Dawson said he started sounding the train's bell and whistle when he first saw the truck; and when he saw the truck start across the tracks, he started blowing the whistle with "a lot of quick blasts." When Mr. Dawson "knew absolutely for sure I was going to hit" the truck, he applied the train's emergency brake.

Jimmie Midkiff, an eyewitness employed by Pen, testified that when Mr. Collins stopped his truck at the crossing, the gates were either down or descending. Mr. Midkiff testified that he attempted to contact the coal truck via a two-way radio to tell the truck driver that a train was coming. Mr.

**2.** According to the railway's third party complaint, the railway paid Mr. Smith $15,000 in settlement of his claim and agreed to pay medical expenses for Mr. Smith's treatment.

Smith, the head brakeman who was on the left/far side of the first locomotive, which had a short hood, said that the truck eased out on to tracks and then stopped, and that it "looked to me like the crossing arm had come down on the rear of the truck." The conductor, who was in the second locomotive on the right/near side, testified that he saw the truck edging to the crossing when the engineer was blowing his whistle. The conductor said that as the gates started down, the truck started around the automatic gates. When Mr. Dawson applied the train's emergency brake, the conductor braced himself, felt the impact and then, saw the truck's tailgate "flying through the air." The rear brakeman who was sitting on the left/far side of the second locomotive could not see the accident.

After Mr. Dawson applied the train's emergency break, he attempted to leave his seat to get behind the control stand to avoid any missiles that might come through the engine's windows. However according to Mr. Dawson, because the head brakeman was already behind the control stand and because the large engineer's seat hampered his movement, he was standing between his seat and the control stand when the train hit the truck. Mr. Dawson gave the following description of the accident's effect on the train: "There was a slack action. The train was torn in two from the slack action. We got a jerk on the head end." Mr. Dawson ended up sitting in his seat. Mr. Dawson testified that if his seat had been a regular stool seat instead of a oversized seat, he would have been able to exit more quickly and if the protection of the control stand was already occupied by the head brakeman, he could have gotten behind the stool seat for protection. As a result of the accident, Mr. Dawson suffered a severe neck injury requiring surgery.

On March 25, 1993, Mr. Dawson, seeking compensation for his injuries, filed suit against the railway, Mr. Collins (the truck driver), and Mr. Hatfield, d/b/a Eagle Trucking Co. (the trucking company).[3] In its answer, the railway filed a cross claim against Mr. Collins and Mr. Hatfield, and the railway also filed a third party claim against P & C "Bituminous Coal," Inc., Pen's predecessor in interest. The railway's third party claim was based on the indemnity provisions of the agreement. After extensive discovery, Pen filed a motion for summary judgment. After discovery was completed, the circuit court at a July 15, 1994 hearing orally granted Pen's summary judgment motion.[4] Contending that summary judgment is inappropriate in this case, the railway appealed to this Court.

II.

## STANDARD OF REVIEW

The central issue of this case is the appropriateness of summary judgment. "A circuit court's entry of summary judgment is reviewed *de novo*." Syl. pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). *In accord Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 58, 459 S.E.2d 329, 335, *rehearing denied* (1995). Our traditional standard for granting summary judgment is stated in Syl. pt. 3, *Aetna Casualty & Surety Co. v. Federal Ins. Co. of N.Y.*, 148 W.Va. 160, 133 S.E.2d 770 (1963). "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." *In accord* Syl. pt. 1, Williams v. Precision Coil, Inc., supra; Syl. pt. 2, *Painter v. Peavy, supra*; Syl. pt. 1, *Andrick v. Town of Buckhannon*, 187 W.Va. 706, 421 S.E.2d 247 (1992).

Rule 56 (1978) of the *W.Va. R.Civ.P.* is "'designed to effect a prompt disposition of controversies on their merits without resort to a lengthy trial,' if there

---

3. According to the railway's brief, the railway paid Mr. Dawson $50,000 to settle all his claims, and Mr. Collins and Mr. Hatfield "also paid Dawson a large amount to settle his claims." Because the railway did not release Pen, the issue on appeal is limited to the railway's recovery from Pen under the agreement's indemnity provision for its property damage of about $10,-

000, its attorneys' fees, and monies paid to settle the claims of Mr. Dawson and Mr. Smith.

4. The order granting summary judgment was actually entered on October 11, 1994 following the railway's efforts to persuade the circuit court that summary judgment would be inappropriate.

essentially 'is no real dispute as to salient facts' or if it only involves a question of law." *Williams v. Precision Coil, Inc.,* 194 W.Va. at 58, 459 S.E.2d at 335, *quoting, Painter v. Peavy,* 192 W.Va. at 192 n. 5, 451 S.E.2d at 758 n. 5, *quoting, Oakes v. Monongahela Power Co.,* 158 W.Va. 18, 22, 207 S.E.2d 191, 194 (1974). Subsection c of Rule 56 states, in pertinent part, that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Syl. pt. 2, *Williams v. Precision Coil, Inc.,* states:

> Summary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove.

*See also* Syl. pt. 4, *Painter v. Peavy, supra.*

■■ According to *Williams v. Precision Coil, Inc.,* the function of the circuit court at the summary judgment stage "is not 'to weigh the evidence an determine the truth of the matter but to determine whether there is a genuine issue for trial.' " 194 W.Va. at 59, 459 S.E.2d at 336, *quoting, Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 212 (1986). *See Gentry v. Mangum,* 195 W.Va. 512, 518–20, 466 S.E.2d 171, 177–79 (1995); *Gooch v. W.Va. Dept. of Public Safety,* 195 W.Va. 357, 465 S.E.2d 628 (1995); Syl. pt. 3, *Painter v. Peavy, supra.* In Syl. pt. 5 of *Jividen v. Law,* 194 W.Va. 705, 461 S.E.2d 451 (1995) we explained what, under Rule 56(c), is a "genuine issue" by stating:

> Roughly stated, a "genuine issue" for purposes of West Virginia Rule of Civil Procedure 56(c) is simply one half of a trialworthy issue, and a genuine issue does not arise unless there is sufficient evidence favoring the non-moving party for a reasonable jury to return a verdict for that party. The opposing half of a trialworthy

issue is present where the non-moving party can point to one or more disputed "material" facts. A material fact is one that has the capacity to sway the outcome of the litigation under the applicable law.

*In accord* Syl. pt. 2, *Morton v. Amos–Lee Securities, Inc.,* 195 W.Va. 691, 466 S.E.2d 542 (1995).

■■ In *Williams v. Precision Coil, Inc.,* we noted that " 'credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.' " *Williams v. Precision Coil, Inc.,* 194 W.Va. at 59, 459 S.E.2d at 336, *quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. at 2513, 91 L.Ed.2d at 216.

■■ In *Fraternal Order of Police, Lodge Number 69 v. The City of Fairmont,* 196 W.Va. 97, 100, 468 S.E.2d 712, 715 (1996), we stated that "there can be no doubt that it is for a trial court to determine whether the terms of an integrated agreement are unambiguous and, if so, to construe the contract according to its plain meaning." Because "questions about the meaning of contractual provision are questions of law, . . . we review a trial court's answer to them *de novo.* (Citation omitted.)" *Id.* See Syl. pt. 3, *Fraternal Order of Police, Lodge Number 69 v. The City of Fairmont, supra;* Syl. pt. 1, *International Nickel Co., Inc. v. Commonwealth Gas Corp.,* 152 W.Va. 296, 163 S.E.2d 677 (1968); Syl. pt. 1, *Berkeley County Pub. Ser. Dist. v. Vitro Corp.,* 152 W.Va. 252, 162 S.E.2d 189 (1968).

With this standard in mind we review the circuit court's grant of summary judgment. In the case *sub judice,* the meaning of the indemnity agreement is the major issue. In granting summary judgment, the circuit court concluded that "there is no evidence present from which reasonable minds can reasonably conclude that Pen Coal was guilty of negligence which was a proximate cause of the injuries sustained by the plaintiff . . . and, therefore, under the terms of the indemnity agreement . . ., Pen Coal is entitled to summary judgment as a matter of law."

## III.

### DISCUSSION

On appeal, the railway outlines two distinct factual scenarios that a rational trier of fact might endorse, which, under the indemnity agreement, would trigger Pen's responsibility to pay. First, the railway contends that a jury might determine that the underlying accident was solely the result of the coal truck's negligence. Secondly, the railway contends that a jury might determine that the underlying accident resulted from the negligence of the railway and the coal truck that was contributed to by Pen. Pen argues that neither of these scenarios would, under the indemnity agreement, result in Pen's liability. Pen argues a threshold requirement under the indemnity agreement is some showing that Pen was negligent, which cannot be done because Pen maintains that, under the indemnity agreement, the railway maintained exclusive control of the crossing.

■■■■ First, we note that the rules governing the requisites and validity of contracts generally apply to contracts of indemnity.[5] In *Sellers v. Owens–Illinois Glass Company*, 156 W.Va. 87, 92, 191 S.E.2d 166, 169 (1972), we stated:

> The rules governing the requisites and validity of contracts generally apply to contracts of indemnity and the language of such a contract must clearly and definitely show an intention to indemnify against a certain loss or liability; otherwise it is not a contract of indemnity. In construing a contract of indemnity and determining the rights and liabilities of the parties thereunder, the primary purpose is to ascertain and give effect to the intention of the parties. 42 C.J.S. Indemnity §§ 4, 5 and 8, pages 567–574. See Annot., 175 A.L.R., pages 29–32.

See *VanKirk v. Green Const. Co.*, 195 W.Va. 714, 720, 466 S.E.2d 782, 788 (1995).

■■■■ We have long held that a valid written agreement using plain and unambiguous language is to be enforced according to its plain intent and should not be construed. Syl. pt. 1, *Payne v. Weston*, 195 W.Va. 502, 466 S.E.2d 161 (1995), states:

> " 'It is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract or to make a new or different contract for them.' *Cotiga Development Co. v. United Fuel Gas Co.*, 147 W.Va. 484, 128 S.E.2d 626 (1962), Syllabus Point 3. Syllabus Point 2, *Bennett v. Dove*, 166 W.Va. 772, 277 S.E.2d 617 (1981)."

*In accord* Syl. pt. 1, *Fraternal Order of Police, Lodge Number 69 v. The City of Fairmont, supra. See* Syl. pt. 1, *Cotiga Development Co. v. United Fuel Gas Co.*, 147 W.Va. 484, 128 S.E.2d 626 (1962) ("A valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent"); Syl. pt. 2, *Orteza v. Monongalia County General Hospital*, 173 W.Va. 461, 318 S.E.2d 40 (1984) ("Where the terms of a contract are clear and unambiguous, they must be applied and not construed").

■■■■ In this case, the indemnity agreement contains two exceptions to complete indemnity by Pen: first, when the railroad is solely negligent [6], and second, when the railroad and an independent third party are jointly negligent "in which the Licensee did not contribute." [7] Under the plain and unambiguous language of the indemnity agreement, the second exception to complete indemnity is activated only when the following three predicates are met: first, the railway must be found negligent; second, an independent third party must be found negligent;

---

5. *See Dalton v. Childress Service Corp.*, 189 W.Va. 428, 432 S.E.2d 98 (1993), for a discussion of when an indemnity agreement violates public policy.

6. Both parties agree that the first exception concerning the sole negligence of the railroad is not applicable in this case.

7. *See* note 1 for the agreement's indemnity provisions.

and finally, Pen must be found not to have contributed.[8]

On appeal, the railway argues that Pen failed to prove as a matter of law that the railway was negligent, the first of the three predicates necessary for the second exception to indemnity to apply. Pen argues that the railway was negligent as a matter of law because: (1) Mr. Dawson failed to apply the train's emergency brake in a sufficient time to avoid the accident; and, (2) Mr. Dawson's injuries were caused by the oversized seat.[9] Neither of Pen's arguments requires a determination that, as a matter of law, the railway was negligent. We note that the question of a timely application of the train's emergency brake contains numerous factual questions, which preclude the grant of summary judgment. In addition, we have long held that a driver about to use a railroad crossing should exercise "ordinary care ... and not attempt to negotiate the crossing in front of an approaching train." *Chesapeake & Ohio Railway Co. v. Jacobs,* 166 Va. 11, 183 S.E. 221 (1936). *See Parsons v. New York Central Railroad Co.,* 127 W.Va. 619, 34 S.E.2d 334 (1945).

The railway maintains that no negligence is proven by Mr. Dawson's mere allegation that the oversized seat hindered him from reaching a safe area. The safe area Mr. Dawson attempted to reach was already occupied by Mr. Smith, who also was injured. The railway argues that Mr. Dawson's injuries were caused by the slack action resulting from application of the emergency brake and the impact with the truck, both of which would have occurred in this case even if the locomotive had been equipped with a stool seat and if the emergency brake had been applied earlier.

On the third and final predicate necessary for the second exception to indemnity to apply, Pen maintains that Pen could not be negligent in causing this accident because under the indemnity agreement the crossing was under the exclusive control of the railway.[10] First, we note that in actuality, the railway did not have exclusive control of the crossing because of the vehicles using the crossing to access Pen's plant. Second, we note that the indemnity agreement does not assign exclusive control of the crossing to the railway. Indeed, the stated purpose of the agreement contradicts Pen's exclusive control argument because Pen and its invitees acquired a license to use the crossing. In section 1 of the indemnity agreement, only the railway is to perform maintenance and upgrade, but the exclusivity of performing maintenance and upgrades is not synonymous with exclusive control. Pen's allegation that the railroad maintained exclusive control of the crossing is not consistent with other sections of the indemnity agreement, such as the prohibition against blocking the tracks, the requirement that Pen make all vehicles to come to a full stop before using the crossing and the broad indemnification provisions.[11] In section 2, the indemnity agreement states that "[t]he fact that maintenance

---

8. Although Pen argues that the third predicate for the second exception requires a finding that Pen was negligent, the term negligent was not used in this part of the indemnity agreement. Instead the indemnity agreement uses the term "contribute," but the agreement does not define what is meant by the term "contribute." According to *Webster's Third New International Dictionary* 496 (1970), "contribute" means:

1 a: to give or grant in common with others ...: give ... for a specified object ... b: to furnish or supply ...: add ... to a common interest or activity ... 2: to supply ... for a publication ~ vi 1 obs: to pay tribute 2: to give a part to a common fund or store: lend assistance or aid to a common purpose: have a share in any act or effect ... 3: to write and submit articles to a publication....

9. The parties agree that common law principles of negligence apply to any determination of the railway's alleged negligence. *See Burlington Northern, Inc. v. Hughes Bros., Inc.,* 671 F.2d 279 (8th Cir.1982); *Steed v. Central of Georgia Ry. Co.,* 529 F.2d 833 (5th Cir.), *cert. denied sub nom., Riegel Textile Corp. v. Central of Georgia Ry. Co.,* 429 U.S. 966, 97 S.Ct. 396, 50 L.Ed.2d 334 (1976).

10. Both Pen and the railway agree that the accident was caused, at least, in part by the negligence of an independent third party, the second of the three predicates necessary to activate the second exception to complete indemnity.

11. *See supra* section I. for sections 3, 5 and 7, respectively, of the indemnity agreement.

of said crossing(s) shall be under the supervision ... of the Railway ... shall *not* relieve Licensee [Pen] of any liabilities and responsibilities herein assumed by the Licensee. [Emphasis added.]"

Finally, Pen maintains that there is no evidence in the record of Pen's negligence.[12] We note that under the plain and unambiguous language of the indemnity agreement, a showing of Pen's negligence or Pen's conduct contributing to the accident is not required for full indemnification. Under the indemnity agreement the question of Pen's "contribution" only arises under the second exception to complete indemnity, which requires the "joint negligence of the Railway and an independent third party in which the Licensee [Pen] did not contribute." If a jury determines that the underlying accident resulted solely from the coal's truck negligence, then Pen would, under the plain and unambiguous language of the agreement, be required to indemnify the railway to the extent that the coal truck failed to made the railway whole because neither of the two exceptions to indemnity would apply.[13]

In this case, there is a factual issue concerning whether Pen contributed to the accident. The railway argues that any of the following determinations might lead a rational trier of fact to conclude that Pen contributed to the accident: (1) the reverse traffic pattern adopted by Pen after the construction of the crossing's safety devices; (2) the sufficiency of Pen's response, namely, posting a sign on the unused far side of the crossing, to the railway's inquiry about trucks avoiding the crossing gates; (3) Pen's failure to notify Mr. Hatfield d/b/a Eagle Trucking of Pen's safety rules and policies; (4) Pen's decision to use automatic safety devises rather than a flagman; or, (5) Pen's failure to notify the railway that full automatic gates barring both right and left traffic lanes were necessary because of the reverse traffic pattern.[14]

Based on our examination of the record, we find that summary judgment should not have been granted in the case *sub judice* because factual issues exist which preclude summary judgment determinations concerning the responsibilities of parties for the accident. In matters concerning the determination of negligence on motions for summary judgment, circuit courts should grant judgment only when the evidence "could not lead a rational trier of fact to find for the nonmoving party." Syl. pt. 2, in part, *Williams v. Precision Coil, Inc. See Jividen v. Law*, 194 W.Va. at 715, 461 S.E.2d at 461 (approving the grant of summary judgment in a negligence case because "there simply is nothing beyond a scintilla of evidence" indicating a failure to exercise ordinary care). The determination of responsibility in this case is similar to the determination of negligence in that both require the drawing of legitimate inferences from facts, which under *Williams v. Precision Coil, Inc.* is a jury function. Thus, in the case at bar, the drawing of legitimate inference from the facts is necessary to determine if the accident falls within one of the two exceptions to full indemnity under the agreement. This jury function should not be precluded by the granting of summary judgment. In *Williams v. Precision Coil, Inc.*, 194 W.Va. at 59, 459 S.E.2d at 336, we stated:

> Summary judgment should be denied "even where there is not dispute as to the evidentiary fact in the case but only as to the conclusions to be drawn therefrom" *Pierce v. Ford Motor Co.*, 190 F.2d 910, 915 (4th Cir.), *cert. denied*, 342 U.S. 887, 72 S.Ct. 178, 96 L.Ed. 666 (1951).

Finally we note that the language of the agreement is plain and unambiguous and should have been applied by the circuit court. Under the agreement, Pen was required to indemnify the railway in all cases except two. The first exception applies in cases of the railway's sole negligence. The

---

12. *See* note 8 discussing the use of the term "contribute" in the indemnity agreement.

13. *See* note 1 for the indemnity provisions of the agreement.

14. Pen contends that under the indemnity agreement, the railway determines what is necessary to insure the safety of this crossing.

second exception applies in cases when there was joint negligence by the railway and an independent third party to which Pen did not contribute. The circuit court erred in finding that the threshold issue to trigger the indemnity agreement was a showing of Pen's negligence. Rather, the question of Pen's contribution arises only in the context of the second exception.

Either of the railway's factual scenarios could under the agreement require Pen to indemnify the railway. If the accident occurred because of the acts of an independent party, Pen would be required to indemnify the railway because neither of the agreement's exceptions would apply. If the accident occurred because of joint negligence by the railway and an independent third party with some contribution from Pen, Pen would be required to indemnify the railway. Based on the plain and unambiguous language of the agreement, we find that the circuit court should not have awarded summary judgment because the record might lead "a rational trier of fact to find for the nonmoving party." Syl. pt. 2, in part, *Williams v. Precision Coil, Inc., supra.*

For the above stated reasons, we find that the Circuit Court of Wayne County, should not have granted summary judgment, and therefore, we reverse the circuit court and remand this case for further proceedings.

Reversed and remanded.