**MILLVILLE QUARRY, INC., Plaintiff,**

v.

**LIBERTY MUTUAL FIRE INSURANCE COMPANY, Defendant.**

**No. 3:98–CV–4.**

United States District Court, N.D. West Virginia.

March 29, 1999.

## *MEMORANDUM OPINION AND ORDER*

BROADWATER, District Judge.

### I. INTRODUCTION

On January 19, 1999, the above-styled matter came before the Court for consideration of the parties' cross-motions for summary judgment (Documents # 20 and # 23). The parties appeared by their respective counsel of record and presented oral arguments in support of their respective memoranda of law. After considering the above, the Court is of the opinion that the plaintiff's motion for summary judgment (Document # 20) should be **DENIED** and that defendant's motion for summary judgment (Document # 23) should be **GRANTED.**

### II. FACTS

The parties have entered into the following stipulation of facts:

1. Liberty Mutual Fire Insurance Company ("Liberty" or "Defendant") issued Policy No.: MC2–61P–004265–015/7 ("Policy") to Bardon Group, Inc., and its affiliates. Millville Quarry, Inc. ("Millville" or "Plaintiff") is an affiliate and is a named-insured under the Policy. The Policy was in effect on the date of the flood.

2. Millville owns and operates a quarry located in Millville, West Virginia. Millville Quarry is a "Covered Location" under the terms of the Policy.

3. Millville owns, utilizes and operates various buildings, structures and equipment at Millville Quarry. Among the structures and equipment at the Quarry is a platform constructed to support water

pumps, which are utilized to remove water which naturally accumulates at the bottom of a quarry. Millville represents that the platform, pumps and associated equipment are located approximately twenty-five feet above the floor of the quarry.

4. The platform and pumps are "Covered Property" under the terms of the Policy.

5. On or about April 4, 1997, ("Date of Loss") water began entering the Millville Quarry through a side wall and through the quarry floor. This flow was estimated over the following three weeks to be from (a low of) 15,000 gallons per minute (g.p.m.) to (a high of) 35,000 g.p.m.

6. By reason of this water entering into the quarry, the water level in the quarry rose and covered the platform and pumps. Eventually, the water rose to an elevation of 85 feet above the quarry floor, sixty feet above the platform and pumps.

7. The events of April 4, 1997, and thereafter, constituted a flood ("Flood") under the terms of the Policy.

8. Millville provided Liberty a "Property Loss Notice" on April 25, 1997, and Liberty treated the Property Loss Notice as a "Notice of Loss."

9. As a result of the flood, Millville installed additional leased pumps on the site with pumping capacity of 25,000 g.p.m. In addition to utilizing these leased pumps, additional piping was installed to discharge the excess water into the Shenandoah River.

10. By May 19, 1997, the water had peaked to a level of 85 feet above the quarry floor. Pumps mounted on a constructed pump barge were installed, which brought the pumping capacity to 29,000 g.p.m. These pumps were unable to discharge sufficient quantities of water to permit the normal quarrying or pumping operations to commence or to repair, rebuild or replace with reasonable speed and similar quality "Covered Property" because the height of the floor water remained above the platform level.

11. On May 19, 1997, Millville submitted its first installment of costs incurred on this flood claim. The majority of those costs dealt with pumping. The total costs to that point were $178,016.30. A request was made for an advance of $250,000.00, which Liberty paid on May 21, 1997. On July 2, 1997, a second installment of pumping costs was submitted by Millville to Liberty. These costs totaled $556,659.00. On September 8, 1997, Liberty issued its check in the amount of $200,000.00 to advance funds against these costs. These amounts were paid by Liberty under the "Additional Expense" coverage of the Policy.

12. Millville retained experts to determine the source of the water entering the quarry. Millville's experts opined that the water was entering the quarry from the Shenandoah River through a series of underground conduits that had developed in the underground Karstic formations.

13. As of mid-August, 1997, a second pump barge had been added. The two pump barges along with the three other pumps discharging through three eighteen-inch pipe lines had reduced the elevation of the water in the quarry to 55 feet above the floor of the quarry. By September 1, 1997, the flow rate of water into the quarry had increased to 38,000 g.p.m., which exceeded the pumping capacity of 33,000 g.p.m. As of the end of September 1997, the water level was back to 80 feet above the quarry floor.

14. Millville, in its attempt to resume normal pumping and quarry operations, grouted the Karstic formations with cement and hot bituminous material ("Grouting Procedure") to stop the flow of water entering the quarry from the Shenandoah River.

### III. SUMMARY JUDGMENT STANDARD

Under Fed.R.Civ.P. 56(c), summary judgment is appropriate if "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, as the United States Supreme Court noted in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106· S.Ct. 2505, 91 L.Ed.2d 202 (1986), Rule 56(c) itself provides that "a party opposing a properly supported motion for summary judgment 'may not rest upon mere allegations or denials of [the] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" "The inquiry performed is the threshold inquiry of determining whether there· is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505. *See also Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979) (summary judgment "should be granted only in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law") (quoting *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir.1950)).

In *Celotex*, the Supreme Court stated that "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." 477 U.S. at 322, 106 S.Ct. 2548. In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Ra-dio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The material facts of this case are not in dispute for the purpose of ruling upon the cross-motions for summary judgment. The sole issue in this case is whether the Plaintiff's claims are covered under the Policy issued by the Defendant.

## IV. DISCUSSION OF LAW

Under West Virginia law, the "mere fact that parties do not agree to the construction of a contract does not render it ambiguous. The question as to whether a contract is ambiguous is a question of law to be determined by the Court." *Jessee v. Aycoth*, 202 W.Va. 215, 503 S.E.2d 528, 529 (W.Va.1998). "A valid written agreement using plain and unambiguous language is to be enforced according to its plain intent and should not be construed." *Dawson v. Norfolk and Western Railway Co.*, 197 W.Va. 10, 475 S.E.2d 10 (W.Va.1995).

Insurance policies are controlled by the rules of construction that are applicable to contracts generally. *Payne v. Weston*, 195 W.Va. 502, 466 S.E.2d 161 (W.Va.1995). Where provisions of an insurance policy contract are clear and unambiguous, they are not subject to judicial construction or interpretation, but full effect will be given to their plain and ordinary meaning. *State Bancorp, Inc. v. United States Fidelity and Guar. Ins. Co.*, 199 W.Va. 99, 483 S.E.2d 228 (W.Va.1997). Only if the court makes the determination that the contract cannot be given a certain and definite legal meaning, and is therefore ambiguous, can a question of fact be submitted to the jury as to the meaning of the contract. *Id.* at 228. Moreover, a court should read an insurance policy provision to avoid ambiguities and not torture the language to create them. *Payne*, 466 S.E.2d at 161. The term "ambiguity" is defined as language "reasonably susceptible of two different meanings" or language "of· such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning." *Id.* at 161 (quoting *Sham-*

blin v. Nationwide Mutual Ins. Co., 175 W.Va. 337, 332 S.E.2d 639 (W.Va.1985)). However, an insurance policy should never be interpreted so as to create an absurd result, but instead should receive reasonable interpretation, consistent with the intent of the parties. D'Annunzio v. Security–Connecticut Life Ins. Co., 186 W.Va. 39, 410 S.E.2d 275 (W.Va.1991).

Finally, "[i]f a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretative facts are in genuine issue." Payne, 466 S.E.2d at 166 (citing Williams v. Precision Coil, Inc., 194 W.Va. 52, 459 S.E.2d 329 (W.Va.1995) (quoting Goodman v. Resolution Trust Corp., 7 F.3d 1123, 1126 (4th Cir.1993))).

Under the Policy, it is undisputed that, under the provision as to interests and property not covered, the following interests and properties are excluded from coverage:

> Land and water whether or not above ground, any other substance in land, water on land, land on which COVERED PROPERTY is located, excavations, gradings or fillings;

(Section IM 1100 MC R1 2L of the Policy) (emphasis in original).

Plaintiff argues that the Additional Expense coverage should include repairing, rebuilding or replacing non-covered property. Plaintiff relies on the language of the Policy to assert that the Policy covers the Grouting Procedure. Under the Additional Expense provision of the Policy, this coverage is provided to

> A. The actual and necessary "additional expense" you incur due to "loss" caused by or resulting from COVERED CAUSES OF "LOSS," to "COVERED PROPERTY" at a COVERED "LOCATION";
>
> B. The actual and necessary "additional expense" you incur due to the action of civil authority which limits access to a

COVERED "LOCATION." This limitation of access must result from "loss" caused by or resulting from COVERED CAUSES OF "LOSS" to property other than at a COVERED "LOCATION."

(Section IM 1103 MC R1 1 of the Policy) (emphasis and quotations in original).

Plaintiff claims the Policy issued by the Defendant provides coverage for the Grouting Procedure. This procedure involved the injection of various materials into existing caverns between the Shenandoah River and the Plaintiff's quarry to stop the flow of water which entered the quarry via the caverns. The Grouting Procedure has cost Plaintiff $6,191,572.50. The Plaintiff claims the Grouting Procedure is covered under the Defendant's Policy by virtue of the Additional Expense coverage provision of the Policy, found in Section IM 1103 MC RI of the Policy. However, the plain language of this Policy provision appears to limit this Additional Expense coverage to expenses incurred due to a loss to Covered Property.

The parties have stipulated that the Policy was in effect on the Date of the Loss, that the Plaintiff was an insured, therefore satisfying the "you" requirement, and that the quarry was a Covered Location. The parties have further stipulated that the events of April 4, 1997 constituted a flood. A flood is a covered cause of loss under Section IM 1121 MC of the Policy. Therefore, the issue before this Court concerns what is Covered Property within the meaning of the Additional Expense coverage and whether Liberty is liable to Millville for the expenses resulting from the Grouting Procedure.

In this case, the only Covered Property involved are the permanent pumps. Thus, the Additional Expense coverage only applies to those additional expenses necessary to attempt to recover those permanent pumps. These pumps were located on the platform inside the quarry and were submerged by flood waters. Further, this coverage is payable only for the necessary period of restoration, defined in the Policy

as the period of time that begins with the date of direct physical loss to Covered Property (pumps), caused by or resulting from Covered Causes of Loss (flood), at a Covered Location (quarry). This coverage ends on the date when the Covered Property (pumps) at the Covered Location (quarry) should be repaired, rebuilt or replaced with reasonable speed and similar quality.

Consequently, pursuant to this provision, the Defendant paid for, as Additional Expense, the costs incurred by the Plaintiff in its failed attempt to recover these permanent pumps until those pumps were actually replaced. Thus, the Defendant has fulfilled its obligations under the Policy. These advances of $450,000.00 were primarily for pumping operations and related expenses. Additionally, the Defendant has also agreed to pay the Plaintiff's claim for these replacement pumps once documentation was provided, establishing the value of this equipment which was replaced.

However, unlike those expenses incurred by the Plaintiff in its failed attempt to recover the permanent pumps under the flood waters, the expenses incurred by the Plaintiff associated with its Grouting Procedure are not covered within the terms of the Additional Expense coverage. The purpose of the Grouting Procedure was not to recover Covered Property, i.e., the pumps, but was to prevent the further inflow of water into the quarry in order to either restore mining operations or to recover the land. The Grouting Procedure greatly exceeds the value of the pumps, estimated at less than one-half million dollars. Additionally, the original pumps have already been replaced. This was done after it was determined that temporary pumps brought in to remove the water from the quarry would not be able to remove the flood water below the level of the original pumps.

The Plaintiff admits that the purpose of the Grouting Procedure was to restore mining operations by recovering the land

or quarry itself. However, unlike the permanent pumps which are Covered Property, land or minerals being mined from the quarry are not Covered Property under the Policy. The basic coverage form found in Section IM 1100 MC of the Policy specifically excludes such coverage. Thus, the costs of stopping the underground flow of water from the Shenandoah River into the quarry are not covered by the Policy.

## V. CONCLUSIONS

For the reasons expressed herein, the Court concludes that the defendant's motion for summary judgment should be granted. However, Defendant is obligated to pay Additional Expense coverage under the terms of the policy only for those actual and necessary expenses the Plaintiff incurred as a result of the loss of the pumps and platform, rock inventory, and damage to the graded road. The Defendant is not obligated to pay for the expenses the Plaintiff incurred as a result of the Grouting Procedure, as such expenses were not incurred as a result of the loss of the pumps and platform and were not necessary expenses incurred to recover or replace the pumps and platform. The Court, therefore

## ORDERS

1. That the plaintiff's motion for summary judgment (Document # 20) be **DENIED;**

2. That the defendant's motion for summary judgment (Document # 23) be **GRANTED** as more fully set forth above;

3. That judgment in favor of the defendant be **GRANTED** consistent with the Court's findings and conclusions herein above.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.