7 F.3d 1123
 Pens. Plan Guide P 23884L
Brenda M. GOODMAN; Jesse S. Weinberg, Plaintiffs-Appellants,
and
Melvin M. Berger, Defendant-Appellant,
v.
RESOLUTION TRUST CORPORATION, as Receiver for
Yorkridge-Calvert Savings and Loan Association,
Defendant-Appellee,
and
Signet Bank/Maryland, Defendant.
 No. 92-2563.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 5, 1993.
Decided Aug. 20, 1993.
 
 1
 Lee Baylin, Bregel, Keer, Davis & Dantes, Towson, MD, argued, for plaintiffs-appellants Goodman and Weinberg.
 
 
 2
 Andrew Jay Graham, Kramon & Graham, P.A., Baltimore, MD, argued (Kathleen A. Birrane, on brief), for defendant-appellant, Berger.
 
 
 3
 Stephen R. Mysliwiec, Piper & Marbury, Washington, DC, for defendant-appellee.
 
 
 4
 Before WILKINS and LUTTIG, Circuit Judges, and KISER, Chief District Judge for the Western District of Virginia, sitting by designation.
 
 OPINION
 KISER, Chief District Judge:
 
 5
 On October 19, 1990, Brenda M. Goodman ("Goodman") and Jesse S. Weinberg ("Weinberg") brought this action in circuit court for Baltimore County against the Resolution Trust Corporation ("RTC") as Receiver of Yorkridge-Calvert Savings and Loan Association ("Yorkridge") and against Signet Bank of Maryland ("Signet Bank") as Trustee seeking a determination that they were entitled to certain trust fund assets. Yorkridge had executed three trust agreements ("Trust Agreements") on behalf of Weinberg, Goodman, and Melvin M. Berger ("Berger") which provided that Yorkridge ("the Employer") shall be treated as the owner of the trust assets, and that "the Trust Fund shall at all times be subject to the claims of creditors of Employer during both the operation period of the Employer or in the event of Employer's insolvency or bankruptcy." This action was removed to the United States District Court for the District of Columbia, pursuant to 12 U.S.C. § 1441a(l )(1), and was later transferred to the United States District Court for the District of Maryland. On August 14, 1992, Judge Black issued a Memorandum Opinion and Order granting the RTC's motion for summary judgment and denying the motion of Goodman, Weinberg, and Berger for summary judgment. Judge Black held that there were no relevant disputes of material fact, and that the RTC had the right under the terms of the Trust Agreements to recover the trust assets in order to satisfy creditors. Judge Black based his ruling on the fact that (i) Section 3.1 of the Trust Agreement made the trust assets subject to the claims of creditors "at all times"; and (ii) the trust assets were subject to the claims of creditors in particular in the event of the employer's "bankruptcy," a term in section 3.1 of the Trust Agreements which must be read to include the receivership of a failed saving and loan association. Goodman, Weinberg and Berger have appealed. We affirm.
 
 I.
 
 6
 In June 1986, the Yorkridge board of directors (the "Board") terminated an unfunded, non-contributory retirement plan for certain members of Yorkridge's senior management to make Yorkridge more profitable by eliminating the ever-increasing liabilities which were accruing on Yorkridge's financial reports. The Board approved, inter alia, three non-qualified Deferred Compensation Agreements which required Yorkridge to make payments, totalling $811,143, to three trusts between Yorkridge and Signet Bank in the following amounts: Berger $571,930, Goodman $160,687, and Weinberg $78,526. These amounts equalled the present value of the future benefits which would have been payable to each officer under the terminated retirement plan. However, Yorkridge had no legal obligation to make these payments totalling eight hundred thousand dollars because the prior retirement plan could have been terminated at any time. Each of the Deferred Compensation Agreements states that the particular officer would have been entitled to benefits under the prior retirement plan if he or she had retired prior to June 30, 1988; however, neither Berger (age 56) nor Goodman (age 45) had reached retirement age as of that date (Goodman also did not meet the years of service aspect of the former retirement plan). The Deferred Compensation Agreements were not retirement benefits since ten annual payments were to be made to each of the three officers regardless of whether the officers had retired, and without any restrictions on eligibility which would have been imposed by the previous retirement plan.
 
 
 7
 The Trust Agreements were set up as grantor or "rabbi" trusts. The initial payment to these trusts is not taxable to the employee, and income generated by the trusts is taxable to the employer rather than to the employee. See Priv.Ltr.Rul. 811307 (December 31, 1980). Each Trust Agreement states that it is "intended to be a grantor trust with the result that the Employer shall be treated as the owner of all the corpus and income of said trust under Section 671 through 679 of the Internal Revenue Code of 1954, as amended from time to time." Trust Agreement p B.
 
 
 8
 As of September 30, 1989, Yorkridge had a negative net worth (i.e. negative "tangible capital") of $12.1 million. Yorkridge had incurred operation losses of $4.5 million in the twelve-month period ending September 30, 1989. It incurred another net operation loss of $451,000 in October 1989 and a similar operating loss in November 1989. The Office of Thrift Supervision ("OTS") projected that Yorkridge would fail to meet its tangible capital requirement of $10.1 million, as of December 7, 1989, by over 100%, or approximately $22.1 million.
 
 
 9
 On December 15, 1989, the OTS, pursuant to 12 U.S.C. § 1464(d), issued an order placing Yorkridge in receivership and appointing the RTC as Receiver. The OTS order was based upon a finding by OTS that Yorkridge was in an "unsafe and unsound condition to transact business in that it has substantially insufficient capital and otherwise," and that Yorkridge "has incurred and is likely to incur losses that will deplete all or substantially all of its capital and there is no reasonable prospect for [Yorkridge's] capital to be replenished without Federal assistance." The OTS Order further stated that Yorkridge was "insolvent on a tangible capital basis," that Yorkridge had incurred "a pattern of consistent losses," and that "there is evidence of imprudent management or business behavior."
 
 
 10
 On December 15, 1989, the RTC was appointed as Receiver of Yorkridge, and the directors of OTS approved the incorporation of a new, federally-charted mutual association, Yorkridge-Calvert Federal Saving Association ("Yorkridge Federal") pursuant to FIRREA, 12 U.S.C. § 1821(d)(2)(G)(i). On December 15, 1989, all of the assets and certain liabilities of Yorkridge were transferred to the new Yorkridge Federal pursuant to a "Purchase and Assumption Agreement." The OTS placed Yorkridge Federal into conservatorship and appointed the RTC as its Conservator. As of December 15, 1990, Yorkridge was not able to pay its debts as they matured. Yorkridge Federal voluntarily paid $289,382.38 in claims again Yorkridge from December 1989 through October 1990.
 
 
 11
 By letter dated June 12, 1990, the Receiver notified Signet Bank that Yorkridge was insolvent and demanded the assets of the three trust funds at issue be paid to the Receiver pursuant to section 3 of the Trust Agreements and pursuant to 12 U.S.C. § 1821(d)(2)(E). The Receiver and Signet Bank agreed that Signet Bank would continue to hold the trust assets pending the resolution of this matter by the court.
 
 
 12
 In September 1990, Yorkridge Federal was placed into receivership. Its insured deposits and certain of its assets, which Yorkridge Federal had obtained from Yorkridge pursuant to the Purchase and Assumption Agreement, were transferred to Household Bank. The RTC, on behalf of Yorkridge Federal, made a $295,564,330.48 payment to Household Bank in connection with this transfer. Thereafter, Yorkridge Federal ceased all operations in September 1991.
 
 
 13
 Yorkridge Federal owes the RTC $238,365,248.11. Yorkridge Federal is also obligated to pay the creditors of Yorkridge, who had received a Receiver's certificate, a pro rata dividend based on the Receiver's estimate of Yorkridge's liquidation value. The assets of Yorkridge Federal are less than its liabilities. As of December 1991, Yorkridge Federal had assets with a book value of $210,442,000 and a projected market value of $137,300,000.
 
 II.
 
 14
 We review a district court's grant of summary judgment de novo, employing the same standard applied by the district court. Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718-19 (4th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1172, 117 L.Ed.2d 417 (1992). In cases of contract interpretation, we have stated:
 
 
 15
 A court faces a conceptually difficult task in deciding whether to grant summary judgment on a matter of contract interpretation. Only an unambiguous writing justifies summary judgment without resort to extrinsic evidence, and no writing is unambiguous if "susceptible to two reasonable interpretations." American Fidelity & Casualty Co. v. London & Edinburgh Ins. Co., 354 F.2d 214, 216 (1965). The first step for a court asked to grant summary judgment based on a contract's interpretation is, therefore, to determine whether, as a matter of law, the contract is ambiguous or unambiguous on its face. If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue. Even where a court, however, determines as a matter of law that the contract is ambiguous, it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis. See Jaftex Corp. v. Aetna Casualty and Surety Co., 617 F.2d 1062, 1063 (4th Cir.1980). If, however, resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact.
 
 
 16
 World-Wide Rights Ltd. Partnership v. Combe Inc., 955 F.2d 242, 245 (4th Cir.1992).
 
 III.
 
 17
 The controversy in this case stems from the meaning of section 3.1 of the Trust Agreements. Section 3.1 states that the trust assets "[S]hall at all times be subject to the claims of creditors of Employer during both the operation period of the Employer or in the event of Employer's insolvency or bankruptcy." Trust Agreements § 3.1.
 
 
 18
 The appellants argue that the language of section 3.1 of the Trust Agreements should be interpreted as making the trust assets available to creditors only in three discrete circumstances: when the employer is (i) "operational," (ii) "insolvent" or (iii) "bankrupt." Appellants contend that neither of these situations is present. Moreover, appellants assert that if the trust assets were open to creditors "at all times" then there would be no reason for the last part of the sentence. Judge Black disagreed and noted that appellants' strained interpretation would require the court to dismiss the phrase "at all times" as irrelevant.
 
 
 19
 The RTC argues that the language of section 3.1 is clear that the trust assets were to remain available to creditors "at all times," even during Yorkridge's operational and nonoperational periods. This was done to obtain the significant tax advantages available to grantor or "rabbi" trusts--that is, that both the initial payment and the interest earned on the trust assets are taxable to the employer.
 
 
 20
 Appellants further argue that the primary objective of the settlor was to protect the beneficiaries of the trusts, not creditors, and hence that any provision making the trust assets available to creditors should be read narrowly. We disagree.
 
 
 21
 Each Trust Agreement states that it was "intended to be a grantor trust," and "that the Employer shall be treated as the owner of all the corpus and income of said trust under Section 671 through 679...." Trust Agreements p B. Thus, the objective of the Trust Agreements was to obtain the favorable tax treatment afforded to grantor trusts; however, such advantageous treatment is not extended without certain strings attached. Federal tax law conditions the beneficial tax treatment of a grantor trust on the requirement that the trust fund remains subject to the claims of the employer's creditors as if the assets were the general assets of the employer. See Mertens Law of Federal Income Taxation § 25B.212 (1988); see also Priv.Ltr.Rul 8113107 (December 31, 1980). The employer is treated as the owner of the trust assets, and the recipients are never assured of a payment because the assets remain subject to the claims of the employer's creditors. "In reality, the recipient receives only the company's unsecured promise to pay benefits and has no right against any assets other than the rights of a general unsecured creditor of the company ... The employer will be treated as the owner of the trust." Mertens Law of Federal Income Taxation § 25B.212 (1988). Grantor trust agreements must be subject to the claims of the creditors at all times, and the appellants structured their deferred compensation benefits as grantor trusts. The RTC, in its capacity as receiver, must collect the assets of Yorkridge and Yorkridge Federal, which necessarily included these grantor trust fund assets, and use these assets to pay the claims of creditors.
 
 IV.
 
 22
 Appellants argue that Judge Black erred in ruling that section 3.1 of the Trust Agreements, which provides that the trust funds shall be subject to the claims of creditors in the event, inter alia, of Yorkridge's "bankruptcy," should not be read to include the receivership of Yorkridge. We disagree. The reference to "bankruptcy" in the Trust Agreements is an obvious misnomer since the Federal Bankruptcy Code specifically excludes banks, saving and loan associations, and other financial institutions from its definition of debtors eligible to seek protection under the Bankruptcy Code. See 11 U.S.C. § 109. If the term "bankruptcy" were narrowly construed to exclude the receivership of Yorkridge, then the term in the Trust Agreements would be devoid of meaning since Yorkridge could never file for bankruptcy. Contract terms must be construed to give meaning and effect to every part of the contract, rather than leave a portion of the contract meaningless or reduced to mere surplusage. Fortec Constructors v. United States, 760 F.2d 1288, 1292 (Fed.Cir.1985). Appellants' arguments that "bankruptcy" does not include "receivership" since receivership is much broader than bankruptcy and that the term "bankruptcy" is not necessarily devoid of meaning because the possibility exists that the Trust Agreements could have been assigned to an entity which was eligible to seek protection in bankruptcy are without merit. The evidence in the record before us shows that the President of Yorkridge did not focus on the use of the term "bankruptcy" and that the Trust Agreements were based on a legal form. (Dep. of Berger 44-46, 50-53). It was appropriate for the district court to grant summary judgment based upon the facts of this case.V.
 
 
 23
 Section 3.1 of the Trust Agreements further provides that the trust fund shall be subject to the claims of creditors, inter alia, in the event of the employer's "insolvency." Section 3.4 of the Trust Agreements defines insolvency as follows:
 
 
 24
 The Employer shall be considered insolvent for purposes of this Trust Agreement if at any time (a) the Employer is unable to pay its debts as they mature or (b) the Employer is subject as a debtor to a pending proceeding under the Bankruptcy Code.
 
 
 25
 Trust Agreement § 3.4. The trial court did not reach the issue of whether Yorkridge or Yorkridge Federal was "insolvent" within the meaning of the Trust Agreements. Nonetheless, this is an alternative ground for affirming the district court grant of summary judgment.
 
 
 26
 On December 15, 1989, Yorkridge became unable to pay its debts as they matured upon the appointment of the Receiver. Immediately after the appointment, all of Yorkridge's assets were transferred to Yorkridge Federal pursuant to the Purchase and Assumption Agreement. No assets remained with which Yorkridge could pay its general liabilities. Yorkridge's general liabilities were not assigned to Yorkridge Federal but remained liabilities of Yorkridge. All assets which Yorkridge would receive in the future could not be used to pay Yorkridge's general liabilities since all assets have been assigned to Yorkridge Federal by the Purchase and Assumption Agreement.
 
 
 27
 Yorkridge's general liabilities are more properly divided into three separate categories. First, there were the claims of general creditors which were voluntarily paid by Yorkridge Federal; Yorkridge, however, was not able to pay these claims as they matured, and even Yorkridge Federal did not pay several of these claims on a timely basis. Second, various pre-receivership claims against Yorkridge were not voluntarily paid by Yorkridge Federal but rather were formally submitted for payment to the RTC as Receiver of Yorkridge. The Receiver has issued Receiver's Certificates for sixteen such claims. Yorkridge was not able to and has not paid these claims. Third, certain claims against Yorkridge, also not paid by Yorkridge Federal, were either not approved by the Receivership or were not presented to the Receiver for approval. Yorkridge was also not able to and has not paid these claims.
 
 
 28
 Yorkridge has been "insolvent," within the meaning of the Trust Agreements, at all times since the Receiver was appointed on December 15, 1989. Appellants' assertion that the Yorkridge Federal insolvency came about because of the RTC's failure to liquidate assets in a commercially reasonable fashion is not supported by the facts in this case.
 
 VI.
 
 29
 Appellants assert that the Deferred Compensation Agreements and related Trust Agreements are "vested" liabilities which are "adequately funded" and constitute "pension, profit sharing and stock ownership plans," within the meaning of section 2 .1(g) of the Purchase and Assumption Agreement. Therefore, according to appellants, the Deferred Compensation Agreements and related Trust Agreements were assumed by Yorkridge Federal, and Yorkridge Federal is the entity whose solvency ought to be measured for the purposes of the Trust Agreements's insolvency.
 
 
 30
 The Deferred Compensation Agreements and related Trust Agreements were not assumed by Yorkridge Federal since they were neither profit sharing plans, stock ownership plans nor pension plans. Annual payments to the recipients were to begin on January 2, 1990, regardless of the employee's retirement status. A pension plan is commonly understood to mean a plan that provides benefits upon retirement. The trust assets are not "vested" or "funded" since they are available to Yorkridge's creditors. See Morton A. Harris and Ronda E. Hobby Qualified Plans, PC's and Welfare Benefits: Owner and Employee Benefits: What's Left? C 583 ALI-ABA 773, (February 21, 1991). Thus, they were not assumed by Yorkridge Federal.
 
 
 31
 Moreover, even if the Deferred Compensation Agreements and related Trust Agreements have been assumed by Yorkridge Federal, pursuant to the Purchase and Assumption Agreement, Yorkridge Federal is also insolvent. Yorkridge Federal was itself placed into receivership in September 1990, and it has ceased all operations. In December 1991, Yorkridge Federal was unable to pay its debts as they matured--Yorkridge Federal still owed the RTC $238,365,248.11, and Yorkridge Federal was also obligated to pay a pro rata dividend to creditors who have been issued a Receiver's Certificate.
 
 VII.
 
 32
 Appellants further contend that the Receiver does not represent the general creditors of Yorkridge. This is preposterous. The RTC is seeking the trust assets at issue in its capacity as Receiver of Yorkridge. In that capacity, the RTC represents not only the institution but also the institution's depositors and other creditors. It is the responsibility of the Receiver under federal law to marshall the assets of the institution and to use those assets to pay the claim of all creditors in the established order of priority. See 12 U.S.C. § 1821(d). The RTC as Receiver, owed a statutory duty to all creditors to collect the institution's assets and to pay the claims of creditors out of those assets.
 
 
 33
 Appellants argue that the trust assets should be used "only insofar as necessary to satisfy debts which cannot otherwise be satisfied from other assets of Yorkridge." (App.Br. 27). The appellants have failed to cite any authority to support this position, and we have found nothing in FIRREA, the Bankruptcy Code, or the language of the Trust Agreements which supports such an argument.
 
 
 34
 Appellants' reliance on the language of section 3.2 of the Trust Agreements, which provides that the trustee may resume payments to the recipients of the Deferred Compensation Agreements if the employer is no longer insolvent, or upon court order, is misplaced. Section 3.2 also provides that nothing in the Trust Agreements shall diminish the recipients' ability "to pursue their rights as general creditors of the employer with respect to deferred compensation or otherwise." Moreover, both Yorkridge and Yorkridge Federal are in receivership and there is no possibility that either one will again become solvent.
 
 
 35
 Appellants are really asking for a preference over other creditors; unfortunately, the recipients of grantor or "rabbi" trusts are unsecured creditors, who took the risks of being subject to the claims of general creditors for the benefits of favorable tax treatment--a gamble which failed to pay off in this case.
 
 
 36
 Appellants claim that other assets of Yorkridge and Yorkridge Federal would be sufficient to pay their creditors, without the trust assets in question. Unfortunately, this assertion is not supported by the evidence. The record shows that Yorkridge Federal has liabilities of over $238.4 million and assets with a projected market value of only $137.3 million. Based upon the record before us, the trust assets in issue are necessary to satisfy the claims of creditors of Yorkridge and Yorkridge Federal.
 
 VIII.
 
 37
 Appellants maintain that the Receiver's claim to the trust assets triggered the termination provision provided in section 6.5 of the Trust Agreements. Section 6.5 states:
 
 
 38
 Subject to the provisions of Section 3, Section 6.2 and Section 12.2 hereof, if the Employer or any successor to the Employer, for any reason, shall disavow or attempt to disavow, terminate or attempt to terminate or in any way attempt not to be bound by this Trust Agreement or any of its provisions without the consent of the beneficiary, the Trust shall immediately terminate and the annuity contracts shall be distributed to the Beneficiary or his successor as of the date of disavowal, termination or attempt of same. For purposes of this Section 6.5, a successor to the Employer shall include any entity which may succeed to the business operations of the Employer by way of purchase of a substantial amount of the assets of the Employer, as well as a successor by merger, consolidation, reorganization or similar event.
 
 
 39
 Trust Agreement § 6.5. Section 6.5 is subject to the provisions of section 3 which provides that the trust assets are subject to the claims of the creditors. The Receiver was proceeding under section 3--on behalf of creditors--in claiming the trust assets; therefore, the termination provision of section 6.5 was not invoked. We agree with Judge Black's ruling that the term "Employer or any successor to the Employer" in section 6.5 could not encompass the RTC, as receiver of Yorkridge, acting for the benefit of creditors.
 
 CONCLUSION
 
 40
 For the reasons stated above, the judgment of the district court is
 
 
 41
 AFFIRMED.