**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

WHEELING-PITTSBURGH STEEL
CORPORATION,
<u>Plaintiff-Appellant,</u>

v.                                              No. 96-1499

CSX TRANSPORTATION,
INCORPORATED; CSX CORPORATION,
<u>Defendants-Appellees.</u>

Appeal from the United States District Court
for the Northern District of West Virginia, at Wheeling.
Frederick P. Stamp, Jr., Chief District Judge.
(CA-94-45-5, CA-94-66-5)

Argued: March 3, 1997

Decided: April 24, 1997

Before MURNAGHAN and ERVIN, Circuit Judges, and
MICHAEL, Senior United States District Judge for the Western
District of Virginia, sitting by designation.

_____

Reversed and remanded by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Basil Carl Culyba, HOWREY & SIMON, Washington,
D.C., for Appellant. Richard McMillan, Jr., CROWELL & MORING,
L.L.P., Washington, D.C., for Appellees. **ON BRIEF:** Andrew E.
Thomas, HOWREY & SIMON, Washington, D.C., for Appellant.

Javier M. Guzman, CROWELL & MORING, L.L.P., Washington, D.C., for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

The instant case involves a contract dispute between Wheeling-Pittsburgh Steel Corporation ("Wheeling-Pitt") and CSX Transportation, Inc. ("CSX") regarding the terms of a contract which implemented a settlement agreement. Both parties moved for summary judgment. The district court found the contract unambiguous in favor of CSX's interpretation and Wheeling-Pitt appeals. Since we find that the language of the contract was unambiguous as to Wheeling-Pitt's interpretation, we reverse the district court's grant of summary judgment and grant summary judgment in favor of Wheeling-Pitt.

I. FACTS

In 1983, Wheeling-Pitt and other steel companies sued CSX and other railroads alleging anti-trust violations. In order to resolve the pending litigation, CSX entered into a settlement agreement with Wheeling-Pitt. The parties used an existing contract, Contract CSXT 2067 ("Contract 2067"), as the implementation device for the settlement agreement. Contract 2067 governed CSX's transportation of coal from Wheeling-Pitt's Omar Mine.

Prior to the settlement agreement, paragraph 3 of Contract 2067 set out the transportation rates which CSX would charge to transport coal for Wheeling-Pitt. As part of the settlement agreement, CSX agreed to provide a $.65 per net ton rate reduction on coal shipped from the Omar Mine. The parties then amended paragraph 3 of Contract 2067

2

to implement the settlement agreement. Amendment 2 to Contract 2067 provided in part:

> Paragraph 3, <u>TRANSPORTATION RATES</u>, is amended to reduce the present contract rate on coal transported from the Omar Mine . . . by sixty-five cents ($.65) per net ton for the period beginning April 4, 1989 and terminating April 3, 1996. The reduction shall become effective April 4, 1989 and shall continue during the term of this Contract as extended. Provided, however, that if Wheeling-Pitt is unable to ship by rail an aggregate of 10.5 million tons from the Omar Mine during the period April 4, 1989 to April 3, 1996, inclusive, the $.65 per net ton reduction described herein will continue in effect until the total tonnage shipped from the Omar Mine reaches 10.5 million tons; or, alternatively, if, during the period through April 3, 1996 Wheeling-Pitt shall sell or otherwise divest itself of its interest in the Omar
> Mine and obtain high-volatile coal from other sources, the $.65 per net ton rate reduction described herein will be applied to the net rate currently in effect, including all reductions, for such other high-volatile coal transportation as may be designated by Wheeling-Pitt, and, in such case a reduction of $.65 per net ton shall continue in effect until the
> total tonnage shipped from all mines, including Omar, beginning April 4, 1989, reaches 10.5 million tons. Provided further that the rates reduced herein will be subject to all future RCCR adjustments,[1] beginning with the April 1, 1989 adjustment, but will at no time be reduced below the rates established by Contract CSXT 2067, as amended.[2]

---

[1] The RCCR is the Railroad Cost Recovery Index published by the Association of American Railroads. The RCCR is a contract rate adjust-
ment and allows the rates in the contract to be adjusted for various costs
such as wage rates and fuel costs. In Contract 2067, the RCCR adjust-
ments are subject to a contract floor and therefore can only lead to an
upward adjustment.

[2] In short the amount by which CSX settled the anti-trust litigation
included $6,825,000 (10.5 million times $.65) payable, however, only to
the extent that Wheeling-Pitt through coal shipments to it from the Omar
Mine (or in effect the successor supplier of coal to Wheeling-Pitt) received coal up to a maximum of 10.5 million tons. By that proviso CSX improved the likelihood that it would continue to carry over its
lines coal shipped to Wheeling-Pitt.

In 1993, Wheeling-Pitt sold the Omar Mine to A.T. Massey Coal Company ("Massey") and entered into a coal supply agreement with Massey whereby Massey would supply all of Wheeling-Pitt's coal requirements for ten years. Massey then entered into a contract with CSX to transport 100% of Wheeling-Pitt's coal requirements at an initial rate lower than that in Contract 2067.

Since Wheeling-Pitt was no longer transporting coal, it designated another shipment to which it requested that CSX apply the $.65 per net ton discount. CSX refused. Wheeling-Pitt argues that it is entitled to the discount, or at least the value of the remaining unrealized discount. CSX argues that the $.65 per ton discount applied only to coal shipped under Contract 2067 and the discount could not be applied to other shipments. At the time Wheeling-Pitt sold the Omar Mine, CSX had not applied the discount to 5,051,164 tons of coal.

## II. DISCUSSION

We review the district court's grant of summary judgment <u>de novo</u>. <u>Roe v. Doe</u>, 28 F.3d 404, 406 (4th Cir. 1994). When considering a summary judgment motion in the context of a contract dispute, the court must first determine whether the contract is ambiguous or unambiguous on its face. <u>World-Wide Rights Limited Partnership v. Combe, Inc.</u>, 955 F.2d 242, 245 (4th Cir. 1992). If the contract is unambiguous, the court may interpret the contract as a matter of law and grant summary judgment. <u>Id.</u>

In interpreting the contract, the court must construe the terms of the contract so as to give meaning and effect to every part of the contract. <u>Goodman v. Resolution Trust Corp.</u>, 7 F.3d 1123, 1127 (4th Cir. 1993). In addition, contracts containing unambiguous language must be construed according to their plain and natural meaning. <u>Fraternal Order of Police v. City of Fairmont</u>, 468 S.E.2d 712, 716 (W. Va. 1996); <u>Marchetti v. Karpowich</u>, 667 A.2d 724, 727 (Pa. Super. Ct. 1995).**3**

---

**3** The parties disagree as to whether West Virginia or Pennsylvania law applies. The Court declines to reach this issue because the canons of contract interpretation are similar in both jurisdictions.

The district court held that the contract was unambiguous and that the $.65 discount only applied to Contract 2067. The district court determined that the language in Contract 2067 which stated that if Wheeling-Pitt sold the Omar Mine then the discount would be applied "to the net rate currently in effect" referred to the rates originally listed in paragraph 3 of Contract 2067. The court thus concluded that the discount could only apply to Contract 2067 and that the "Court finds nothing in the amendment to Contract 2067 or in the settlement agreement which would indicate that the 65 cent per ton discount was intended to be applied to a contract to which Wheeling-Pitt is not a party."

However, the district court's interpretation of the contract fails to give meaning and effect to every part of the contract. In addition, the settlement agreement and the amended version of Contract 2067 clearly and unambiguously anticipated that the discount would continue to apply absent Contract 2067. Furthermore, the contract clearly and unambiguously intended that the discount would apply to contracts to which Wheeling-Pitt was not a party.

The clause "net rates currently in effect" must be read in the context of the entire paragraph. Earlier in the paragraph, the clause provides that if Wheeling-Pitt sells the Omar Mine and obtains coal from other sources the discount will apply to the "net rate currently in effect, including all reductions" for such other coal as designated by Wheeling-Pitt. Since this provision anticipates that Wheeling-Pitt might sell the Omar Mine, the reference to obtaining coal from other sources must apply to coal from a source other than Wheeling-Pitt. If "other sources" applies to coal provided by third parties, then the contract clearly anticipates that the discount will apply to coal supplied by other parties and transported by CSX. Otherwise, the anti-trust settlement would be largely scuttled if the Omar Mine was sold by Wheeling-Pitt. Yet Amendment 2 to Contract 2067 clearly provides that the $.65 per net ton reduction will remain in effect until "the total tonnage shipped from all mines including Omar . . . reaches 10.5 mil-

lion tons" (emphasis added).

In addition, the language in paragraph 3 clearly states that
Wheeling-Pitt has the right to designate the other shipments to which
the discount will apply. Since it is clear that if Wheeling-Pitt sold the

5

Omar Mine it would no longer supply its own coal, its right to designate other shipments must include its right to designate shipments supplied by third parties and transported by CSX.

Furthermore, the district court's interpretation of"net rates currently in effect" does not give each term in the contract meaning. First, "net rates" itself would be surplusage. The plain meaning of "net rate" is the rate "which remains after all allowable deductions" have been made. Black's Law Dictionary 1040 (6th ed. 1990). Thus, the net rate would be the rate after other deductions and allowances have been made. However, if the district court's interpretation is given to "net rate" then the language which follows "net rates," which is "including all reductions," becomes redundant and hence surplusage. If net rates includes all reductions there would be no need to specify "including all reductions" after the words "net rate."

A more logical reading, and one which does not make the reference to "net rates" or the reference to "including all reductions" surplusage, is that the provision applies to coal delivered by other sources. The reference to net rate would be the net rate per ton including the RCCR adjustments. The reference to "including all reductions" would apply to volume discounts or other incentives to which another carrier might be entitled. Thus, Wheeling-Pitt would be entitled to the net rate in effect for the other supplier, and would also be entitled to the benefit of any other reductions which CSX provided to the supplier. **4** However, under CSX's interpretation of the contract, the phrase "including all reductions" would be irrelevant. As part of the amended Contract 2067, the parties canceled the incentive refunds to which Wheeling-Pitt was entitled under Contract 2067. Thus, if the phrase only applied to Contract 2067, the term "net" and the phrase "including all reductions" would serve no purpose.

_____

**4** For example, Massey, as a large supplier of coal, might receive incentive reductions from CSX once it ships a certain amount of coal. This would not be factored into the "net rate" per ton since it would be

unknown if the supplier would reach the incentive amount. The language
"including all reductions" allows Wheeling-Pitt to get the benefit of fur-
ther reductions.

6

The contract contains additional language which unambiguously favors Wheeling-Pitt's interpretation that the $.65 reduction applies outside of the context of Contract 2067. First, the contract states that if Wheeling-Pitt does not ship 10.5 million tons by April 3, 1996, the "$.65 per net ton reduction described herein will continue in effect until the total tonnage shipped from the Omar Mine reaches 10.5 million tons." However, Contract 2067 by its own terms terminated on April 3, 1996, and the contract explicitly provided for a continuation of the discount even after the contract expired. The contract did not provide for an automatic extension of the contract, but rather provided for a continuation of the discount even after the contract expired. Thus, the contract cannot be the sole mechanism for the discount since the parties clearly intended the discount to apply even in the absence of the contract.

Second, when the contract was negotiated, Wheeling-Pitt knew that it might sell the Omar Mine. It therefore negotiated language which provided that the discount would continue even if Wheeling-Pitt sold the Omar Mine. That language states:

> alternatively, if, during the period through April 3, 1996, Wheeling-Pittsburgh shall sell or otherwise divest itself of its interest in the Omar Mine and obtain high-volatile coal from other sources, the $.65 per net ton rate reduction described herein will be applied to the net rates currently in effect . . . for such other high-volatile coal transportation as may be designated by Wheeling-Pittsburgh, and, in such case, the reduction of $.65 per net ton shall continue in effect until the total tonnage shipped from all mines, including Omar, beginning April 4, 1989, reaches 10.5 million tons.

Thus, if Wheeling-Pitt sold the Omar Mine, the contract explicitly allowed it to designate other shipments to which the discount would apply. As discussed previously, since Wheeling-Pitt would no longer be a supplier of coal, the provision anticipates that the reduction would apply to other shipments by other suppliers. Thus, the clear language of the contract allows Wheeling-Pitt to designate another contract, to which it is not a party, to which the discount should apply.

7

CSX still receives a benefit since the $.65 per net ton reduction applies only to coal transported by CSX.

CSX argues that even if it had a duty to provide the discount to Wheeling-Pitt it has done so, since the discount was built into the rate which CSX charges Massey, the current supplier of coal to Wheeling-Pitt. Although the rate CSX charges Massey is lower than the rate CSX charged Wheeling-Pitt, including the discount, there is no evidence in the record that the rate CSX charges Massey includes the $.65 discount.

First, the contract between CSX and Massey was a commercially negotiated agreement between the two parties. There is no evidence that Wheeling-Pitt was involved in the negotiations. In fact, there is evidence in the record that Wheeling-Pitt continued to assert its rights to the discount even as CSX was negotiating its agreement with Massey.

Second, the contract between CSX and Massey does not just cover rates charged to Wheeling-Pitt. The contract also covers coal supplied by Massey for U.S. Steel Corporation. Third, Massey was a much larger supplier of coal than Wheeling-Pitt and there is evidence in the record that Massey's lower rate was due to its significant bargaining leverage and not due to the $.65 per net ton discount.

Finally, the contract with Massey runs through 2004. There is no language in the contract that the rate will go up by the amount of the discount once the discounted rate has been applied to 10.5 million tons of coal under Wheeling-Pitt's original anti-trust settlement agreement. If CSX only gave Massey the discounted rate due to the settlement agreement, the contract should have contained language increasing the rate once CSX met its settlement obligation.

The language at issue unambiguously gives Wheeling-Pitt the right to the $.65 per net ton discount on 10.5 million tons of coal. We reverse the district court's grant of summary judgment in favor of CSX and grant summary judgment as to Wheeling-Pitt. We remand the case to the district court for further proceedings consistent with this opinion.

REVERSED AND REMANDED