**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1694**

CONSUMER FINANCIAL PROTECTION BUREAU; CONSUMER
PROTECTION DIVISION, Office of the Attorney General of Maryland,

Plaintiffs – Appellees,

v.

GARY KLOPP

Defendant – Appellant,

and

GENUINE TITLE, LLC; BRANDON GLICKSTEIN; ADAM MANDELBERG;
WILLIAM J. PETERSON, III; ANGELA POBLETTS; JAY ZUKERBERG; ALL
COUNTY SETTLEMENTS, LLC; BTS MANAGEMENT AND CONSULTING,
LLC; CARROLL ABSTRACTS, INC.; MARC, LLC; MORTGAGE SERVICES,
LLC; R&R MARKETING GROUP, LLC,

Defendants.

Appeal from the United States District Court for the District of Maryland, at Baltimore.
Richard D. Bennett, District Judge. (1:15-cv-01235-RDB)

Argued: October 29, 2019                    Decided: April 27, 2020

Before HARRIS, RICHARDSON, and QUATTLEBAUM, Circuit Judges.

Affirmed in part, vacated in part, and remanded in part by published opinion. Judge Richardson wrote the opinion, in which Judge Harris and Judge Quattlebaum joined.

———————————

**ARGUED:** Harry Levy, SHUMAKER WILLIAMS, PC, Towson, Maryland, for Appellant. Hanna Abrams, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland; Joseph Anthony Frisone, CONSUMER FINANCIAL PROTECTION BUREAU, Washington, D.C., for Appellees. **ON BRIEF:** J. Steven Lovejoy, SHUMAKER WILLIAMS, PC, Towson, Maryland, for Appellant. Mary McLeod, General Counsel, John R. Coleman, Deputy General Counsel, Steven Bressler, Assistant General Counsel, CONSUMER FINANCIAL PROTECTION BUREAU, Washington, D.C.; Brian E. Frosh, Attorney General, Philip D. Ziperman, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees.

RICHARDSON, Circuit Judge:

After finding Gary Klopp in violation of a consent order limiting his participation in the mortgage industry, the district court held him in contempt and ordered the disgorgement of over half-a-million dollars of his contemptuous earnings. Klopp appeals the district court's contempt and disgorgement orders.

The district court cited several proper reasons for holding Klopp in contempt. Because "[a] single violation [of an order] is sufficient to support a finding of contempt," *Rainbow School, Inc. v. Rainbow Early Education Holding LLC*, 887 F.3d 610, 618 (4th Cir. 2018), we affirm the district court's contempt decision. Yet the district court rested its disgorgement sanction on an erroneous legal interpretation of the terms of the underlying consent order. Since the disgorgement order rested on improper grounds, we vacate that order and remand for further proceedings.

## I.    Facts

### A.    The pay-to-play scheme and Consent Order

Gary Klopp managed a mortgage brokerage branch of the Peoples Bank & Trust in Owings Mills, Maryland. A decade ago, Klopp started taking kickbacks from a title-service company.[1] According to regulators, for every loan that Klopp or his agents steered to a particular title company, he received roughly $400 in return. Between 2011 and 2013, the title company funneled more than half-a-million dollars to Klopp through two

---

[1] Title service companies, in exchange for a fee, verify the legitimacy of a seller's title to a parcel of real estate, and they sometimes insure that title. This service gives purchasers—and mortgage lenders—confidence in a property transaction.

Maryland shell corporations that Klopp created and controlled. Neither of Klopp's shell companies provided any genuine services for these payments, and Klopp concealed this kickback arrangement from his customers.

Klopp's dealings were part of a grander "pay-to-play" scheme uncovered by federal and state regulators. In April 2015, the regulators began a civil action against Klopp and twelve codefendants in the District of Maryland for violating federal and state consumer finance laws. Some of Klopp's codefendants quickly settled with the regulators. Those early settlements limited the codefendants' "participation in the Mortgage Industry in any professional capacity" and imposed civil money penalties. *E.g.*, Dist. Ct. Dkt. No. 14 at 5.

Klopp's settlement was different. In November 2015, Klopp and the regulators negotiated and proposed a Stipulated Final Judgment and Order to the district court ("Consent Order"). The Consent Order levied a civil money penalty of $75,000. And it imposed various other non-monetary requirements and restrictions, two of which drive this appeal.

In the first set of requirements, Klopp agreed to restrictions on his activities in the mortgage industry. The Consent Order "limited [Klopp] from participation in the Mortgage Industry for two years . . . as follows:"

a. [Klopp is] prohibited from contacting, soliciting, or otherwise dealing with consumer borrowers or loan applicants in any capacity with regard to any mortgage business; and

b. [Klopp is] prohibited from contacting, soliciting, or otherwise dealing with any third party businesses engaged in offering any settlement service.

J.A. 49. A safe-harbor provision followed these prohibitions:

4

c.  These limitations shall not prohibit Defendant Klopp from acting solely as a personnel or human-resources manager for a mortgage business operated by an FDIC-insured banking institution . . . .

*Id.*

In the second set of requirements, Klopp assented to various reporting measures. Klopp agreed to upload the Order to the Nationwide Mortgage Licensing System and Registry ("Registry") within 60 days.  He also promised to report any change in his residence, in his roles in "any business activity," and in "any entity in which [he has] any ownership interest" to the regulators for two years.  J.A. 51–52.  And Klopp had to notify the regulators "of any development that may affect compliance obligations arising under" the Consent Order. J.A. 51.  The district court accepted the Parties' proposed resolution of Klopp's case and issued the negotiated Consent Order.

Over the next two years, Klopp defied the Consent Order with aplomb.  Without notifying regulators, he rented a house in California and opened a new branch of the Peoples Bank & Trust in Orange County.  He continued to deal with third-party businesses engaged in settlement services.  And he never uploaded the Consent Order to the Registry.

**B.    The 2017 civil contempt hearing**

When the regulators learned of Klopp's actions, they moved to hold him in contempt.  The district court held a contempt hearing in August 2017.

At the hearing, regulators presented documentary evidence to support their assertions that Klopp had violated the order.  Klopp took the stand in defense and made several admissions.  He acknowledged that he never uploaded the Consent Order to the Registry.   Klopp similarly admitted to continuing to deal with third-party settlement

5

services. *E.g.*, J.A. 146–47 ("Q: But the fact is that you were asking for a loan—an interest rate concession on a particular consumer loan; isn't that right? A: It appears that way."). And he admitted that he never notified regulators of his new office in California.

Klopp also described his employment agreement with Peoples Bank & Trust. The agreement compensated Klopp based on the greater of a $2,000 monthly salary or certain profits earned by his brokerage branches. Between January 2016 and March 2017, the business generated an estimated $765,000 in profit, $700,000 of which Klopp allocated to his own earnings.

Based on this evidence, the district court found Klopp violated both the activity restrictions and the reporting requirements of the Consent Order. For the activity restrictions, the court found that he impermissibly managed the business, profited from the mortgage industry, and communicated with settlement servicers. And the district court found that Klopp violated the reporting restrictions by failing to upload the Consent Order to the Registry and not informing the regulators of his California activities.

### C. The 2018 sanctions hearing

After holding Klopp in civil contempt, the district court held a sanctions hearing. At the hearing, Klopp acknowledged $987,920 in profits from his business for the period between the effective date of the Consent Order, November 16, 2015, and April 27, 2018. Klopp argued that receiving profits from his business did not violate the Consent Order. But the district court rejected this argument because it "contradict[ed] [its] ruling at the contempt hearing." J.A. 1041 n.8. The district court also rejected Klopp's suggestion that the money he invested in the business should be deducted from that amount, seeing it as

6

evidence of Klopp's operation of his mortgage business. The court similarly refused Klopp's contention that his earnings accruing after the expiration of the Consent Order in November 2017 should not be considered, reasoning that Klopp should not be "shielded by the expiration date of an Order with which he never complied." J.A. 1042.

At the same time, the district court rejected the regulators' position that all of Klopp's earnings during this time should be disgorged. Instead, the district court deducted the $2,000 in monthly compensation that it believed Klopp was entitled to as human-resources manager, as well as Klopp's tax withholdings, which reduced the profits to $526,796.36. The court ordered Klopp to disgorge that amount and expressly barred him from all involvement in the mortgage industry for another two years. Klopp timely appealed.[2]

## II. Discussion

When a litigant violates an order, the court generally may exercise its authority to hold the violator in civil contempt. *Rainbow School, Inc. v. Rainbow Early Education Holding LLC*, 887 F.3d 610, 617 (4th Cir. 2018). "The essence of civil contempt," we have explained, "is to coerce" compliance with judicial orders. *Consolidation Coal Co. v. Local 1702, United Mineworkers of America*, 683 F.2d 827, 830 (4th Cir. 1982). And sometimes an award of damages is necessary to "incentivize" compliance. *Rainbow School*, 887 F.3d at 617 (citing *Hutto v. Finney*, 437 U.S. 678, 691 (1978)). Civil contempt orders—and the appropriate consequences for violating them—fall to the district court's discretion.

---

[2] On appeal, Klopp does not challenge the new two-year bar.

Klopp challenges both the district court's contempt findings and the amount of the disgorgement order. Because the sanctions for civil contempt must be causally related to contemptuous conduct, *see Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1185−86 (2017), resolution of Klopp's sanctions arguments depends on the violations found by the district court. We consider each issue in turn.

## A.      The contempt order was proper

We review the district court's civil contempt order for an abuse of discretion. *In re Under Seal*, 749 F.3d 276, 285 (4th Cir. 2014). So we scrutinize factual findings for clear error and evaluate legal questions anew. *Id.*; *see also Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 112 (4th Cir. 2013). And when the district court cites multiple reasons for a contempt order, we need only to confirm the propriety of one of those reasons: "A single violation," we have held, "is sufficient to support a finding of contempt." *Rainbow School*, 887 F.3d at 618; *see also In re Under Seal*, 749 F.3d at 293.

Civil contempt hearings employ a burden-shifting framework. The party who moves for a civil contempt order must first prove each of these elements by clear and convincing evidence:

(1) the existence of a valid court order;

(2) the order was in the moving party's "favor";

(3) a knowing violation of the terms of the order; and

(4) the moving party suffered harm from the violation.

*United v. Ali*, 874 F.3d 825, 831 (4th Cir. 2017). Once the movant establishes these elements, the burden shifts to the defendant to show "good faith [in making] all reasonable

8

efforts to comply with the enforcement order." *Id.* A defendant who fails to meet this burden may be held in civil contempt.

Here, Klopp argues that the regulators failed to make their affirmative case: He asserts that the regulators failed to show that he violated the activity restrictions, and he contends that no harm resulted from any of the reporting violations.

### 1. Activity restrictions

The district court found that Klopp violated the activity restrictions for two reasons. First, the court found that Klopp was profiting from and "running the [mortgage] business"—activities the court considered prohibited under the Consent Order. J.A. 219. Second, the court determined that Klopp "communicat[ed] with lender and title companies." *Id.* Klopp admits to managing the business but disagrees with the district court's interpretation of the Consent Order.

### (a) Management of the mortgage business

Klopp argues that the Consent Order did not clearly prohibit him from earning a profit and managing the business. The Order "limited [Klopp] from participation in the Mortgage Industry for two years . . . as follows:"

a. [Klopp is] prohibited from contacting, soliciting, or otherwise dealing with consumer borrowers or loan applicants in any capacity with regard to any mortgage business; and

b. [Klopp is] prohibited from contacting, soliciting, or otherwise dealing with any third party businesses engaged in offering any settlement service.

c. These limitations shall not prohibit Defendant Klopp from acting solely as a personnel or human-resources manager for a mortgage business operated by an FDIC banking institution . . . .

9

J.A. 49.

Klopp reads these restrictions narrowly—he may manage the business so long as he does not deal in a prohibited manner with (a) consumer borrowers or (b) certain third-party businesses. So in Klopp's view, management of his mortgage business did not violate the Consent Order. On the other hand, the district court adopted the regulators' broad interpretation: Klopp may "act[] solely, *solely*, as a personnel or human resources manager." J.A. 218 (emphasis added). So any other participation in the mortgage industry would violate the Consent Order.

The interpretation of a negotiated order is a legal question that we review de novo. *See American Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 512 (4th Cir. 2003); *Willie M. v. Hunt*, 657 F.2d 55, 60 (4th Cir. 1981).[3] We interpret consent orders using "traditional rules of contract interpretation, and the district court's authority is thus

---

[3] Some of our cases have adopted a more deferential posture when reviewing a district court's interpretation of its own orders. *See, e.g.*, *In re Grand Jury Subpoena (T-112)*, 597 F.3d 189, 202 (4th Cir. 2010) ("When evaluating a district court's interpretation of its own decree, we are properly respectful of the district court's superior position to evaluate its order."). And other circuits have suggested that appellate review of a district court's interpretation of a consent order is both "deferential" and "de novo" at the same time. *See Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 371–72 (6th Cir. 1998) (applying a "deferential de novo" standard when "reviewing the interpretation of a consent judgment by the district court that crafted the consent judgment"); *Goluba v. Sch. Dist. of Ripon*, 45 F.3d 1035, 1037–38 (7th Cir. 1995) (reviewing district court's interpretation of a consent decree de novo but "nonetheless giv[ing] some deference to the court's interpretation" when the court "oversaw and approved the consent decree").

As our interpretation of the Consent Order would remain the same, we need not determine whether our plenary review incorporates some measure of deference. *Cf. United States v. Boyd*, 55 F.3d 239, 242 (7th Cir. 1995) (Posner, J.) (noting that there are more verbal formulations of the scope of appellate review than distinctions capable of being drawn).

constrained by the language of the decree." *Thompson v. U.S. Dep't of Housing & Urban Development*, 404 F.3d 821, 832 n.6 (4th Cir. 2005); *see also Willie M. v. Hunt*, 732 F.2d 383, 386 (4th Cir. 1984). As the Supreme Court has explained, consent orders like the one at hand "are entered into by parties to a case after careful negotiation has produced agreement on their precise terms." *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971). Thus, the consent orders themselves "cannot be said to have a purpose" but reflect the negotiations between adverse parties before approval of the court. *Id.* "For these reasons, the scope of a consent [order] must be discerned within its four corners, and not by reference to what might satisfy [its] purposes." *Id.* at 682. And the district court "has no authority to expand or contract the judgment's terms to reflect what might have been." *Willie M.*, 657 F.2d at 60.

Even so, the district court seemed to base its interpretation on its own understanding of the Consent Order's purpose. *See* J.A. 207 ("I signed the order. I know what the case is about. I know what my intention was."). This would be an error. Abiding by the court's own subjective intent rather than an objective interpretation of the document would violate the first "cardinal principle[]" for interpreting consent orders: "meaning is properly to be sought within the confines of the judicially approved documents expressing the parties' consent." *Willie M.*, 657 F.2d at 60.

With this interpretive principle in mind, we turn to the terms of the Consent Order, which "*limited* [Klopp] from participation in the Mortgage Industry . . . *as follows*[.]" J.A. 49 (emphasis added). By limiting Klopp's participation "as follows[,]" the Order "confine[d]" or "set bounds to" Klopp's involvement in the mortgage industry in specified

11

ways, *Limit*, 8 Oxford English Dictionary 964 (2d ed. 1989); it did not erect a complete bar to his participation.  Indeed, the Consent Order that applied to Klopp contrasts with the broader settlements reached by other codefendants.[4]  These orders limited defendants "from participat[ing]in the Mortgage Industry *in any professional capacity*."  *E.g.*, Dist. Ct. Dkt. No. 14 at 5 (emphasis added); *see also, e.g.*, *In the Matter of William C. Gennity*, Exchange Act Release No. 85,246, 2019 WL 1033860, at *2 (Mar. 4, 2019) (Respondent "is barred from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization.").

There is no similarly broad prohibition in the Consent Order that applies to Klopp, "and we will not read one into it."  *Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999).  First, the Parties knew how to draft a broad agreement but did not do so here.  Words matter, particularly compared to those used in other orders in the same case.  *See Quadrant Structured Prod. Co. v. Vertin*, 16 N.E.3d 1165, 1172 (N.Y. App. 2014) ("[I]f parties to a contract omit terms—particularly, terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission.").  And second, subjecting a litigant to contempt liability—whether civil or criminal—requires a clear indication of what is prohibited.  *See Acosta v. La Piedad Corp.*,

---

[4] "Obedience to the 'four corners' rule . . . does not make improper the use of certain aids to construction where necessary.  The circumstances surrounding the formation of the consent order . . . may properly inform a court while it yet adheres to the 'four corners' rule."  *Willie M.*, 657 F.2d at 60.

894 F.3d 947, 951 (8th Cir. 2018) ("A party cannot be held in contempt for violating an ambiguous court order."). An order limited "as follows" is hardly a clear imposition of a similarly comprehensive ban. J.A. 49.

The subparagraphs that follow delineate specific restrictions: Klopp is prohibited from "contacting, soliciting, or otherwise dealing with" borrowers or certain third-party servicers. *Id.* Again, the restrictions do not generally ban Klopp from the mortgage industry but limit his interactions with specific categories of individuals and business in specific ways.

Of course, one could read "otherwise dealing with" expansively to include any involvement in the mortgage industry. But the rules of interpretation counsel against this overbroad construction. The rule of *ejusdem generis* teaches that a general term at the end of a list refers to items of the same class as the specific terms. *See Swift & Co. v. Columbia Railway, Gas & Electric Co.*, 17 F.2d 46, 48 (4th Cir. 1927); 11 Williston on Contracts § 32:10 (4th ed.). When we apply this rule to the list of prohibited activities, "contacting, soliciting, or otherwise dealing with," the consent order looks much narrower. J.A. 49. The term "otherwise dealing with" appears to be a general term referring to business dealings that—like "contacting" and "soliciting"—involve direct communication with certain persons outside the business. *Id.* This interpretation is underscored by the context of this litigation. *See Willie M.*, 657 F.2d at 60. Restricting outward-facing roles limits Klopp's ability to solicit kickbacks; permitting inward-looking management roles allows Klopp to continue to run his business. Under this narrower interpretation, Klopp was not prohibited from running a mortgage-origination business or from managing its employees.

13

The regulators argue that subparagraph (c) somehow expands the scope of subparagraphs (a) and (b). Since "the plain meaning of the provision is that the *only* role that Mr. Klopp could play in the mortgage industry was in a human resources capacity," it supposedly reinforces the breadth of the Consent Order. Appellees' Br. 17. We disagree. Subparagraph (c) begins with the words "*[t]hese limitations* shall not prohibit," showing that subparagraph (c) itself confines the limitations given in subparagraphs (a) and (b). J.A. 49 (emphasis added). We fail to see how this safe harbor that by its own terms *narrows* the restrictions applicable to Klopp should instead be read to broaden them. So activities that were never within the scope of subparagraphs (a) and (b)—such as managing the entire business and profiting from his investment—do not fall within those subparagraphs when they are further tapered.

The regulators next argue that Klopp's narrower reading would render subparagraph (c) superfluous. *See Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1127 (4th Cir. 1993). Not so. Subparagraph (c) would, for example, allow Klopp to contact lenders to investigate personnel complaints—a classic HR function. In contrast, the regulators' broad interpretation would create the very superfluousness they seek to avoid. If Klopp was in fact limited to acting *solely* as an HR manager, there would be no need to prohibit him from "soliciting" consumer borrowers or servicers in subparagraphs (a) or (b). J.A. 49. So we reject the regulators' overbroad interpretation.

For these reasons, Klopp's management of the business was not categorically barred by the Consent Order, and the district court erred in finding it was a valid ground for contempt.

14

### (b) Communications with third parties

Although managing the business was not itself barred by the Consent Order, Klopp could still violate the specific activity limitations in subparagraphs (a) and (b) by his management conduct. And so the district court also found that Klopp continued to communicate impermissibly with third-party businesses engaged in settlement services.[5] This violation of subparagraph (a) is supported by the record. *See, e.g.*, J.A. 300 ("Q: how often in a month would you chime in on anything to do with a particular loan? A: probably less than a dozen."); J.A. 138 (discussing repeated communications with lenders); J.A. 146–47 (requesting an interest rate concession from a lender for a particular consumer loan). So the court properly rested its contempt finding on Klopp's communications. And, in any event, Klopp fails to explain on appeal why this contempt finding was erroneous. *See United States v. Jones*, 308 F.3d 425, 427 n.1 (4th Cir. 2002) (arguments not raised on appeal are waived).

### 2. Reporting requirements

The district court also found violations of various reporting requirements in the Consent Order. First, Klopp had to upload a copy of the final order to the Registry. The

---

[5] Settlement services include "any service provided in connection with a real estate settlement including, but not limited to . . . the origination of a federally related mortgage loan (including, but not limited to, the taking of loan applications, loan processing, and the underwriting and funding of loans), and the handling of the processing, and closing or settlement." 12 U.S.C. § 2602(3); *see* J.A. 48 (incorporating this statutory definition into the Consent Order).

15

district court determined that Klopp "blatantly did not do it." J.A. 220. And the court also found that Klopp "did not do so because he didn't want to advertise [the Order]." J.A. 220.

On appeal, Klopp concedes that he failed to upload the Order but asserts that no harm came from his failure. Appellant's Br. 33–34. In so doing, he suggests—as he did below—that regulators must prove a specific monetary harm arising from his violation. *See* J.A. 224 ("the argument of counsel is that unless there's some kind of monetary harm that's shown . . . there's been no harm"). We reject the premise—our caselaw recognizes informational harms not connected to any specific monetary loss. In *Rainbow School*, the contemnor, like Klopp, argued that no harm was shown where the movant violated an order about an intangible trademark violation that did not lead to specified monetary damages. 887 F.3d at 619. But we explained that the harms in that case—confusion and mark dilution—were in fact sufficient to establish harm in the contempt analysis. *Id.*

Those harms, as here, are informational harms disconnected from exact monetary damages. As the district court noted, the Registry is "a nationwide platform that provides for improved coordination and information shared among regulators and increased efficiencies for the industry and enhanced consumer protection." J.A. 226. When Klopp failed to upload the Consent Order, Klopp's counterparties—and regulators in other jurisdictions—were disadvantaged from the lack of information in the Registry. *See* J.A. 156–58. Given these specific factual findings, the district court did not abuse its discretion when it found Klopp in violation for failing to upload the Consent Order. And in an industry where informational asymmetries are a predominant factor in product pricing and selecting counterparties, the importance of this form of harm should not be minimized. *See*

16

*United States v. Danube Carpet Mills, Inc.*, 737 F.2d 988, 993 (11th Cir. 1984) (where "information reaching the public posesse[s] the capacity to deceive, 'the Government [is] not obligated to adduce evidence of specific injuries to consumers'") (quoting *United States v. Reader's Digest Ass'n, Inc.*, 662 F.2d 955, 969 (3d Cir. 1981)).

Second, the Consent Order required Klopp to notify regulators of "any change in residence" or "any change in title or role in any business activity . . . and any entity in which [Klopp has] any ownership interest." J.A. 51−52. Yet without giving any notice, Klopp rented a home in California and set up another branch of the Peoples Bank & Trust in Orange County. As to this provision, the district court found that "six months of residence in [California]" and "setting up the same kind of business that he has in Maryland . . . in the state of California [is a] clear violation" of the Order. J.A. 221. We agree with the district court's legal interpretation here. And these findings are strongly supported by the record. *See, e.g.*, J.A. 284 ("Q: Have you lived in California? A: I have a temporary residence in California. I rented a house . . . out there last year. And actually I still have a house rented there now, yes."); J.A. 297 ("Q: Do you have a branch that you manage out there [in California]? A: Yes.").

Klopp again argues that these violations caused no concrete harm. In Klopp's view, although the Consent Order was written "to ensure the Regulators could track Mr. Klopp and his business activities," they nevertheless caught him and "pursue[d] contempt proceedings against him." Appellant's Br. 33. The implications of this argument would effectively immunize Klopp from enforcement of this provision—either Klopp is never discovered or, if he is, no harm occurs. For the reasons given above, we find the

17

informational harm here legally sufficient and supported by the record. So we likewise reject this argument.

For these reasons, the district court properly found Klopp in violation of the Consent Order's reporting requirements. And, in sum, because the district court identified at least one violation of the Consent Order, it did not abuse its discretion by holding Klopp in contempt.

## B.    The district court's disgorgement order

As with the contempt order, we review the sanctions imposed by the district court for an abuse of discretion. *See Rainbow School*, 887 F.3d at 617; *In re General Motors Corp.*, 61 F.3d 256, 259 (4th Cir. 1995). District courts enjoy wide latitude in imposing a sanction that is "compensatory," "incentivizing," or both. *Rainbow School*, 887 F.3d at 620. "'[W]hen a court imposes fines and punishments on a contemnor, it is not only vindicating its legal authority to enter the initial court order, but it also is seeking to give effect to the law's purpose of modifying the contemnor's behavior to conform to the terms required in the order.'" *International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 828 (1994) (quoting *Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 635 (1988)).

Disgorgement—the payment of profits arising from improper conduct—is one such sanction. *See S.E.C. v. JT Wallenbrock & Associates,* 440 F.3d 1109, 1113 (9th Cir. 2006). As the Supreme Court explained, "[t]he primary purpose of disgorgement" is deterrence "by depriving violators of their ill-gotten gains." *Kokesh v. S.E.C.*, 137 S. Ct. 1635, 1643 (2017) (internal quotations and citation omitted); *see also* Russell G. Ryan, *The Equity*

18

*Façade of SEC Disgorgement*, 4 HARV. BUS. L. REV. ONLINE 2–5 (2013) (discussing disgorgement). Disgorgement is commonly understood as a form of restitution, "limited to restor[ing] the status quo." *Tull v. United States*, 481 U.S. 412, 424 (1987).

Considering the purposes of a civil contempt sanction, a fine imposed by the district court must be causally connected to the reasons for contempt. *See Goodyear*, 137 S. Ct. at 1185−86; *see also CFPB v. Gordon*, 819 F.3d 1179, 1195 (9th Cir. 2016). As to the amount of disgorgement, Klopp argued that managing the business and receiving profits did not violate the Consent Order. But the court rejected that argument in calculating the contemptuous income because "that view directly contradicts this Court's ruling at the contempt hearing." J.A. 1041 n.8. Thus, the court assumed that managing the business was improper and set out identifying Klopp's profits from his business because *any such profit* was contemptuous income. J.A. 1042–43.

But, as discussed above, the district court's view that managing the business and accepting profits from the mortgage industry violated the Order depends on an overbroad interpretation of the Consent Order. Thus, the district court's approach to calculating disgorgement hinged on activity that did not violate its order—it lacked the necessary causal connection between these profits and a violation. So we find that, justified on this basis, ordering disgorgement of the business profits was an abuse of discretion.[6]

---

[6] Because the primary basis for the entire sanctions order was invalid, we need not address whether the profits that accrued to Klopp after the expiration of the Consent Order were causally connected to his contemptuous conduct. And we express no opinion on whether the disgorgement of those profits would be appropriate considering Klopp's other violations of the Consent Order. We leave these questions to the district court on remand.

*          *          *

District courts possess broad contempt authority to ensure that litigants respect and adhere to court orders. But broad authority is not unlimited authority. When a court enters a consent order, its power is constrained by the objective terms of that order. So the court may not find a party in contempt of that order unless its terms are violated. And when a court sanctions a litigant for contempt, it must connect those sanctions to an actual violation.

Here, the district court erred in its broad interpretation of the Consent Order: Klopp could properly manage the business and earn a profit from its operation. Klopp nevertheless violated other provisions of the district court's order and so we affirm the district court's contempt order. But because the district court based its sanctions on the improper contempt finding, we vacate the disgorgement order and remand for the court to reassess the consequences of Klopp's contempt.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*

20